Concepción de Goenaga, demandante y recurrida, *v.* Luis y José O'Neill de Milán, demandados y recurrentes.

*Número:* 12020   *Resuelto:* 19 de abril de 1962

173

*Juan B. Soto, Esteban Susoni Lens* y *Benjamín Ortiz,* abogados de los recurrentes; *Mariano Acosta Velarde* y *Daniel Pellón Lafuente,* abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Se trata de un recurso interpuesto por la parte demandada en una acción sobre cumplimiento específico de un contrato de venta de una parcela de terreno situada en el barrio Hato Rey del antiguo Municipio de Río Piedras. El principal punto debatido es si a la fecha en que se realizó la venta—27 de junio de 1945—los terrenos que colindaban por el lado norte de esa parcela realmente habían sido urbanizados formando una vía pública llamada "Calle Número 5."

La señora Concepción de Goenaga alegó en su demanda enmendada, en síntesis: que en el año 1945 los hermanos demandados, Luis y José O'Neill de Milán eran dueños de un solar radicado en Hato Rey que tenía un área de 5,927 metros cuadrados, y constaba inscrito en el Registro de la Propiedad

de Río Piedras "como una urbanización denominada 'Garden City,' dividida en manzanas, calles y solares, todo ello de acuerdo con el plano de urbanización hecho por el agrimensor señor Carlos Castro Martínez y aprobado por el Departamento de Sanidad el día 12 de noviembre de 1926"; que el 27 de junio de 1945 los demandados segregaron de esa finca un solar que vendieron a la demandante y que se describe así:

"URBANA: Parcela de terreno compuesta de 1465.22 metros cuadrados en lindes: por el Norte, en 36.90 *con la calle Núm. 5 en proyecto de esta urbanización;* por el Sur en 37.50 metros con la calle O'Neill (antes Calle Núm. 1); por el Este en 38.50 metros con la finca principal; y por el Oeste en 40.50 metros con la calle Núm. 4 en proyecto de esta urbanización." —Énfasis suplido.—

Continuó alegando que hizo construir en la parcela descrita un edificio de concreto, de una planta, donde tenía establecido un taller de costura, "habiéndose diseñado y construido el dicho edificio considerando las colindancias Norte, Sur y Oeste del solar comprado a los demandados con las calles números 5, 4 y O'Neill"; que la calle número 5, colindancia Norte del solar, "ha estado siempre abierta al tránsito público y ha sido siempre usada, considerada y tenida por la demandante, así como por la comunidad, como una vía pública de la referida urbanización 'Garden City', y según plano que le fue mostrado a la demandante y por el cual ella compró"; que los demandados con el propósito de privar al público en general y especialmente a la demandante del uso y disfrute de la referida calle número 5 y en violación al contrato de compraventa, maliciosa y voluntariamente acudieron ante la Junta de Planificación y a espaldas de la demandante solicitaron la lotificación del remanente de la finca, ocultando a dicha Junta la venta hecha a la demandante y especialmente el hecho de que la calle Núm. 5 colindaba al Norte con la parcela que ellos le vendieron, alegando falsamente ante la Junta que el remanente de la finca colindaba por el Sur "en parte con terrenos de la demandante en vez de con la calle Núm. 5"; que sin oírse

ni citarse a la demandante la Junta en marzo 18 de 1953 aprobó la lotificación del remanente de la finca en dos solares, uno de 1820.289 metros cuadrados, señalado con la letra "A" y el otro de 1118.675 metros cuadrados, señalado con la letra "B"; que los demandados vendieron el solar letra "B" cuya colindancia Norte no era el resto de la finca sino la calle Núm. 5, y que se proponían vender el solar letra "A", que no colinda con la parcela de la demandante sino con la dicha calle Núm. 5; que el codemandado Luis O'Neill de Milán por sí y como mandatario de su hermano José le había informado a la demandante "que la calle número 5 ha sido eliminada y que ni ella ni el público en general, tiene derecho a transitar ni usar dicha calle como vía pública y se ha opuesto y opone a que la demandante construya acera a lo largo de la colindancia Norte de la finca de la demandante, o sea, la acera Sur de la calle número 5", violando así el contrato de compraventa, impidiéndole transitar libremente por dicha calle y utilizarla como vía de comunicación o tránsito y como predio serviente de luz, vista, aire y paso, constituida sobre la finca de los demandados y a favor de la propiedad de la demandante, la que ha perdido en valor, ocasionándose la reducción considerable del negocio de ella, estimando los daños y perjuicios en una suma no menor de $15,000.00.

Solicitó sentencia la demandante con los siguientes pronunciamientos específicos: (1) decretando que la parcela de la demandante colindaba por el Norte con dicha calle número 5 en proyecto; (2) decretando que las nuevas parcelas "A" y "B" colindaban por el Sur con la calle número 5; (3) ordenando que el Registrador tomara razón de tales colindancias; (4) ordenando a los demandados se abstuvieran de vender la parcela "A" sin mencionar que la misma colindaba por el Sur con la calle número 5; (5) prohibiendo a los demandados eliminar la calle número 5 y apropiarse dicha faja de terreno; (6) decretando que el remanente de finca estaba afecto, en lo que se refería a la proyectada calle número 5, a una servi-

dumbre de paso, aire, luz y vista a favor de la finca de la demandante y así se hiciera constar en el Registro; y (7) que se condenara a los demandados a pagarle $15,000.00 por daños y perjuicios de probarse que ellos habían vendido a terceras personas el todo o parte del remanente de la finca principal o si por cualquier otro motivo los demandados no pudieran cumplir con las condiciones contraídas para con la demandante mediante la escritura de compra otorgada entre ellos.

Los demandados contestaron la demanda enmendada aceptando parte de los hechos expuestos en la misma y negando los demás, especialmente la existencia real de la urbanización "Garden City" y de su calle número 5. Sus defensas tercera y cuarta son las siguientes:

"Tercera Defensa.—

"1. El año 1932 el plano de urbanización hecho por el agrimensor Carlos Castro Martínez y aprobado por el Departamento de Sanidad de Puerto Rico, a que se refiere la demandante en el apartado 3 de la demanda enmendada, quedó sin efecto en virtud de lo dispuesto en el artículo 4 de la Ley número 11, de abril 11 de 1931.

"2. Doce años más tarde, o sea el año 1945, los demandados, no habiendo desarrollado la susodicha urbanización y habiendo desistido de la misma, acordaron otorgar y otorgaron ante el notario Rafael R. Fuertes, la escritura número 11 de 27 de junio de 1945, con miras a agrupar, formando una sola finca, los solares diseñados en el plano de la dicha urbanización y llevando a cabo tal propósito, los demandados hicieron expresamente constar en la susodicha escritura, que dejaban sin efecto la aludida urbanización o división en solares, reagrupándolos para formar una sola finca, que se describe como sigue:

'RÚSTICA: solar de cinco mil novecientos veintisiete metros cuadrados, colindante al Norte, en ciento cuatro metros, con la vía férrea de la American Railroad Company que conduce de San Juan a Carolina, colindando además en treinticinco metros, con terrenos de don Luis Ocasio, antes don Juan B. Huyke; por el Sur, en ciento treintiséis metros, con la calle O'Neill, antes calle número uno de esta urbanización; por el Este, en cuarentiocho metros con la calle número seis de esta urbanización, antes terrenos de doña Catalina Lefebre, y en

veinte metros con terrenos de don Juan Pacheco Tavares, antes señor Hutchinson; y por el Oeste, con terrenos de don Martín Martell, antes calle número dos.'

"3. Desistida de esta suerte la referida urbanización y agrupados los solares (que de haberla desarrollado la integrarían) en la finca que se describe en el inciso anterior, los demandados procedieron a segregar de dicha finca, y segregaron una parcela de terreno compuesta de 1465 metros con 22 centímetros cuadrados; la cual, a los fines de su identificación, describieron con las siguientes colindancias:

'Por el Norte, en treintiséis metros con noventa centímetros con la calle número cinco en proyecto de esta urbanización, por el Sur, en treintisiete metros con cincuenta centímetros con la calle O'Neill, antes calle número uno de esta urbanización; por el Este, en treintiocho metros con cincuenta centímetros con terrenos de los vendedores; y por el Oeste, en cuarenta metros con cincuenta centímetros con la calle número cuatro en proyecto de esta urbanización.'

"4. Toda vez que las calles nombradas en la descripción de la parcela segregada no aparecen ni pueden aparecer construidas ni trazadas sobre el terreno, por no haberse procedido nunca a desarrollar la dicha urbanización, y porque, además, el permiso concedido por el Departamento de Sanidad había caducado por ministerio de la ley, los demandados, para mayor claridad en la identificación de dicha parcela, hicieron constar, que las calles nombradas en la descripción de la misma, aparecen diseñadas en el referido plano hecho ante el agrimensor don Carlos Castro Martínez.

"5. Dejada sin efecto la aludida urbanización, reagrupados los solares formando una sola finca, y hecha la segregación de la descrita parcela, los demandados procedieron a vender a la demandante, quien compró, la parcela segregada, por el precio de $4,395.66; constándole a la demandante que la referida urbanización había quedado sin efecto, y que la referida calle número 5 nunca había sido construida, ni trazada sobre el terreno y que sólo había sido diseñada en el plano de la extinta urbanización.

"6. La referida calle número 5 no podría ser construida, aun queriéndolo los demandados, sin la autorización de la Junta de Planificación de Puerto Rico; la cual, alegan los demandados, ha manifestado su oposición a que dicha calle se construya, por entender que de acuerdo con la mejor técnica de

urbanismo, la construcción de dicha calle afectaría seriamente al mejor desarrollo urbano del área donde habría de construirse.

"Cuarta Defensa.—

"La finca o parcela vendida por los demandados a la demandante, no estaba al efectuarse la venta, ni lo está en la actualidad, enclavada entre otras de los vendedores; y sí está contigua a varias vías públicas."

En la conferencia con antelación al juicio se convino que "el caso se circunscribe a determinar si la parcela comprada por la demandante a los demandados tiene establecida a su favor la servidumbre de paso, luz y vista a que se refiere la demanda enmendada, y en caso afirmativo, determinar el montante de los daños sufridos por la demandante si los demandados no pudieran establecer dicha servidumbre."

Fue el pleito a juicio. Ambas partes presentaron evidencia oral y documental. Se practicó una inspección ocular. Se decidió el caso en favor de la demandante, suscribiendo el juez sentenciador una extensa relación del caso con sus conclusiones de hecho y de derecho. El fallo declaró la existencia de una "servidumbre de paso, luz, aire y vista" sobre una faja de terreno de 63.901 metros de largo por 13 metros de ancho—o sean 830.713 metros cuadrados—que se extendía de este-oeste desde la Avenida Muñoz Rivera (antes y, en parte, la calle seis de la proyectada urbanización) hasta la calle Núm. 4 y a través de la parcela "A" de 1820.289 metros cuadrados propiedad de los demandados, como predio sirviente, y a favor de la parcela propiedad de la demandante como predio dominante; ordenó su inscripción en el Registro y, además, condenó a los demandados al pago de las costas y honorarios de abogado.

Apelaron ante nos los demandados. Las partes sometieron el recurso por su extensos y muy bien elaborados alegatos en los que hábilmente discuten los distintos puntos señalados por cada una.

Los recurrentes imputan la comisión de diecisiete errores respecto a las conclusiones de hecho y de diez respecto a las

de derecho. Con excepción de las primeras tres conclusiones de hecho, impugnan específicamente cada conclusión. A veces es tan violenta la tónica de expresión que emplean, que la desaprobamos. (¹)

El análisis y estudio que hemos hecho de las conclusiones del tribunal de instancia y de los planteamientos envueltos en el recurso, a la luz de todos los hechos y circunstancias concurrentes y de las disposiciones legales aplicables, nos ha producido la firme y definitiva convicción de que las principales determinaciones,—aunque aceptemos que estén sostenidas por la evidencia admitidas o autorizadas por alguna plausible interpretación de derecho—por las razones que expondremos no representan el balance más racional, justiciero y jurídico en la resolución del caso, y que, por esa razón, son clara y manifiestamente erróneas, procediendo la revocación del fallo recurrido.

En la exposición de nuestros fundamentos seguiremos el orden trazado por las partes en la discusión de las cuestiones debatidas, considerando en conjunto, a veces, los puntos suscitados. (²)

---

(¹) A la página 4 de su alegato, en parte, exponen:

"Y con fecha 5 de mayo de 1955 el Juez Superior emite un fallo en que despoja a los demandados-apelantes de terrenos legítimamente de ellos, los que arbitrariamente concede a la demandante-apelada.

"Ante este Honorable Tribunal se apela, pues, de una sentencia viciada de parcialidad y de prejuicio, una sentencia inconsulta, indocta, desprovista de los soportes jurisprudenciales mínimos para hacer recaer sobre los demandados-apelantes una sentencia máxima; un fallo desleal a los hechos, en que el Juez Superior presenta como 'Conclusiones de Hecho', falsas alegaciones de la demandante-apelada, y sienta como 'Conclusiones de Derecho' unas veces deducciones de esos mimos falsos hechos, y otras, intrpretaciones ilógicas de la Ley y la Jurisprudencia.

"Se apela ante este Honorable Tribunal de una sentencia francamente alarmante, puesto que tiende a que los ciudadanos pierdan la fe en los pacíficos procesos de la justicia y en la eficacia de los procedimientos judiciales."

(²) Los recurrentes no impugnan las primeras tres conclusiones de hecho que transcribimos a continuación para un cabal entendimiento del caso:

I

Los primeros cinco señalamientos de errores atacan las conclusiones de hechos números 4, 5, 6, 7, 8 y 9, que dicen así:

"4. La finca Núm. 4996 de los demandados y adquirida de don Juan B. Huyke la urbanizaron los demandados según plano de fecha 14 de septiembre del año 1926 del ingeniero señor C. Castro Martínez.

"5. Los demandados denominaron dicha urbanización 'Garden City.'

"6. El día 7 de octubre del año 1926 la Asamblea Municipal de Río Piedras, P. R., impartió su aprobación a la urbanización 'Garden City.'

"7. El día 12 de noviembre del año 1926 el Gobierno Insular, por su Departamento de Sanidad, aprobó la urbanización 'Garden City.'

"8. La finca Núm. 4996 de los demandados o sea la urbanización 'Garden City', *según el plano de urbanización*, se componía de las siguientes manzanas, solares y calles:

"Manzana 'B' con un área de 2417.72 m/c dividida en 10 solares y colindando la dicha manzana 'B' por el norte, con la calle Núm. 5; por el sur, con la calle O'Neill, antes calle Núm. 1; por el este con la calle Núm. 6, y por el oeste con la calle Núm. 4.

"Manzana 'C' con un área de 1492.38 m/c dividida en cinco solares colindando la dicha manzana 'C', por el norte con la vía férrea de la American Railroad Co. of Puerto Rico; por el sur con la calle O'Neill, antes calle Núm. 1; por el este con la calle Núm. 4, y por el oeste en 19.10 metros con la calle Núm. 3.

---

"Conclusiones de Hecho

"1. Los demandados [Luis y José O'Neill de Milán] adquirieron de don Juan B. Huyke y su esposa doña Carmen Colón, una parcela de 5927 metros cuadrados inscrita al folio 195 del tomo 96 de Río Piedras, finca Núm. 4996, inscripción primera.

"2. La parcela adquirida por los demandados del señor Huyke se describe en la escritura Núm. 11, de junio 27 de 1945, otorgada en San Juan, Puerto Rico, ante el notario Lcdo. Rafael R. Fuertes, dividido en 10 solares enumerados del 1 al 10, con distintas áreas, pero todos extendiéndose de norte a sur y colindando en su frente en 12 metros con la calle Núm. 1.

"3. La referida calle denominada Núm. 1 es hoy la calle O'Neill."

"Manzana 'D' con un área de 1013 metros cuadrados dividida en 4 solares colindando todos ellos por el sur con la calle Núm. 5.

"9. La calle Núm. 5, con una longitud de 63.30 metros por 10 metros de ancho y 1.50 metros a cada lado para aceras, separa la manzana letra 'B' de la manzana letra 'D' y se extiende de este a oeste conectando las calles Núm. 6 con la Núm. 4."—Énfasis suplido.

Atacan también los recurrentes las siguientes determinaciones de derecho, consecuentes a las de hecho transcritas:

"El tribunal es de opinión que la urbanización Garden City hecha de la finca Núm. 4996 por los demandados, por haber sido aprobada el día 7 de octubre de 1926 por el municipio de Río Piedras, hoy Capital de Puerto Rico, demarcación territorial ésta donde ubica la finca, así como por haber sido aprobada dicha urbanización por el Gobierno Insular el día 12 de noviembre de 1926, dicha urbanización se rige por los preceptos de la Ley Núm. 69, aprobada por la Asamblea Legislativa de Puerto Rico el día 3 de agosto de 1925 (véase Leyes de Puerto Rico, 1925, pág. 367).

"El tribunal opina que una vez aprobada definitivamente por el Gobierno Insular y por el municipio la urbanización Garden City, tanto la calle Núm. 5, como todas las calles de dicha urbanización, pasaron a ser de la propiedad del Municipio de Río Piedras, hoy de la Capital de Puerto Rico, según los preceptos de la sección 3 de la Ley 69 de 1925, así como por la interpretación dada a dicha ley por nuestro Tribunal Supremo en el caso de Zayas vs. Junta de Planificación, 69 D.P.R. 30."

La evidencia aportada al juicio no justifica ni puede constituir u ofrecer base de hecho o de derecho alguno para concluir que los hermanos O'Neill habían urbanizado antes del 27 de junio de 1945 la parcela de 5927 metros cuadrados bien bajo el nombre de "Urbanización Garden City", o bajo cualquier otra denominación, ni mucho menos que la llamada Calle Núm. 5 pasara "a ser propiedad del Municipio de Río Piedras."

De la propia evidencia documental de la parte demandante se desprende lo siguiente:

En el año 1926 don Juan B. Huyke y su esposa doña Carmen Colón eran dueños de una parcela de terreno de 66,231.53 metros cuadrados radicada en dicho barrio de Hato Rey.    Con el Núm. 977 la tenían inscrita en el Registro de la Propiedad.

Sin que aún se les hubiera otorgado título alguno sobre parte de esos terrenos pertenecientes a los esposos Huyke-Colón, los hermanos O'Neill, demandados-recurrentes en unión a Alejandro Rodríguez, encargaron en ese año al delineante C. Castro Martínez la preparación de un plano para la construcción de una urbanización que llevaría el nombre de "Garden City" de "Rodríguez-O'Neill, Hato Rey, Río Piedras."    Los terrenos a urbanizarse componían una parcela de 18,137.19 metros cuadrados, ubicada al oeste de la antigua Carretera Central, tramo de Santurce a Río Piedras, hoy parte de la Avenida Ponce de León.    Su entrada y salida principal era una franja recta de terreno que la atravesaba de este a oeste, partiendo de la antigua Carretera Central, que finalmente se denominó "Calle O'Neill."

El 14 de septiembre quedó terminado el plano.    Conforme al mismo, los terrenos que aportaban los hermanos O'Neill eran unos 6,463.73 metros cuadrados, y estaban situados al norte de esa "Calle O'Neill"; se dividieron en las manzanas "B", "C" y "D".    La primera de estas manzanas, que tiene un área de 2417.72 metros cuadrados, se subdividió en diez solares, el mayor de 281.44 metros cuadrados, y el menor de 213.75 metros cuadrados; cuatro de ellos aparecen colindando por su lado norte con una "Calle No. 5" dibujada en el plano y la que ocuparía unos 615.10 metros cuadrados de terreno, teniendo una longitud, por su lado sur, o sea la colindancia norte de esos cuatro solares, de 61.90 metros y 10 metros de ancho.    La longitud del lado norte de esa calle era menor que la de su lado sur.    Esa Calle No. 5 se dibujaba conectando la calle número 6 del plano con la número 4, que correrían de sur a norte.

Conforme con la Ley Núm. 69 del 3 de agosto de 1925 [3] el plano fue sometido al estudio y aprobación de la Asamblea Municipal de Río Piedras. Este organismo lo aprobó el 7 de octubre de 1926. [4]

Siete días después el contratista Luis Rexach remitió al ingeniero sanitario el antiguo Departamento Insular de Sanidad, para su aprobación, el referido plano. [5] El 12 de noviembre del mismo año ese departamento también lo aprobó.

---

[3] En sus primeras tres secciones dispone esta ley:

"Sección 1.—Siempre que se intente proceder a la urbanización de terrenos anexos a las ciudades o pueblos de la Isla de Puerto Rico, los planos referentes a tal urbanización, antes de ser aprobados por el Departamento Insular de Sanidad, deberán ser previamente sometidos al estudio y aprobación de la asamblea municipal de la ciudad o pueblo correspondiente.

"Sección 2.—La asamblea municipal aprobará o no las urbanizaciones que le sean sometidas, siempre que el bien de la comunidad· y las circunstancias locales lo exijan; pero si después de haberse presentado a una asamblea cualquier proyecto de urbanización transcurriere un año de ello, sin tomarse acuerdo en pro o en contra por tal asamblea, esto se considerará como una aprobación de la urbanización, siendo suficiente una certificación del secretario municipal sobre ello para que el Departamento Insular correspondiente pueda proceder a la aprobación definitiva de la urbanización en proyecto.

"Sección 3.—Una vez aprobado [sic] definitivamente por el Gobierno Insular y por el municipio una urbanización, se entenderá que ésta entra a formar parte de la urbe, y la conservación de sus calles y demás servicios públicos quedan a cargo y serán propiedad del municipio correspondiente."

[4] En la parte pertinente, se hizo constar en el asiento del Libro de Actas correspondiente a esa aprobación:

"7. Se da lectura al informe del Alcalde en relación con la urbanización 'Floral Park' en Hato Rey que tiene presentados planos para su aprobación, y fue acuerdo aprobar los referidos planos, así como también se aprueban los de los Sres. Arturo González para urbanizar una parcela de terreno en Hato Rey, parada 35, los presentados por el Sr. Luis Rexach a nombre de Valdés, Cuyar & García, para urbanizar terrenos en la parada 27, Martín Peña, y los de los Sres. O'Neill & Rodríguez, para otra urbanización en la parada 30 en Hato Rey."

[5] La carta cursada al efecto, dice:

"Sr. Luis Rexach, Contractor & Builder, Exclusive Agent in Porto Rico for Milliken Brothers Mfg. Co. Office at Martín Peña, San Juan, P. R.—Octubre 14, 1926. Sr. Ingeniero Sanitario, San Juan, P. R. (Por conducto del Jefe Local de Sanidad de Río·Piedras.)

Hasta el 7 de marzo de 1927 nada se había hecho en relación con la proyectada urbanización "Garden City"; ni tan siquiera los hermanos O'Neill habían adquirido título escrito sobre la parcela de 6463.73 metros cuadrados a urbanizarse a nombre de ellos con arreglo al plano aprobado. En esta fecha se otorgó ante el notario Bolívar Pagán por don Juan B. Huyke y su esposa y los hermanos O'Neill, una escritura mediante la cual los primeros segregaron de su finca Núm. 977 una parcela de 5927 metros cuadrados cuya colindancia sur era la mencionada Calle O'Neill, antes Calle Núm. 1, midiendo por ese frente 136 metros. Dividieron la parcela segregada en diez solares, todos con frente o entrada al sur y a la Calle O'Neill, y por el norte con la finca principal y con terrenos del ferrocarril. El mayor de ellos tenía un área de 1096 metros cuadrados y el menor de 216 metros cuadrados. Esa parcela de 5927 metros, así dividida en diez solares se vendió, por el mismo documento a los hermanos O'Neill. Se inscribió a nombre de ellos en el Registro de la Propiedad, bajo el número 4996 y con la siguiente descripción general:

"RÚSTICA: solar compuesto de cinco mil novecientos veintisiete metros cuadrados, colindante al Norte, en ciento cuatro metros con la vía férrea de la American Railroad Company que conduce de San Juan a Carolina, colindando además en treinta y cinco metros, con terrenos de don Juan B. Huyke; por el Sur, en ciento treinta y seis metros, con la calle número uno que se abrirá en esta urbanización en cualquier tiempo antes de ser pagado el importe total de estos terrenos; por el Este, con terrenos de doña Catalina Lefebre, en cuarentiocho

"Señor: Acompaño a la presente tres copias de un plano de urbanización de ciertos terrenos que en la parada 29 en Hato Rey poseen los Sres. Alejandro Rodríguez y Luis O'Neill.—Este plano fue presentado a la Asamblea Municipal de Río Piedras y aprobado por ésta en sesión del día 7 del corriente mes, según certificación constante en los azules que remito.—El trabajo que se proyecta hacer incluye calles de 10 metros de ancho total, dejando 1.50 metros a cada lado para aceras. Encintado y badén de concreto de 60 cms. de ancho. Instalación de agua en todas las calles con acometida directa al tubo de 20 de la carretera central. Afirmado macadam de 0.25 metros de espesor y asfaltado.—Atentamente (firmado) Luis Rexach."

metros, y en veinte metros con terrenos del señor Hutchison; y por el Oeste, con la calle número tres que se abrirá en esta urbanización."

Se dice que la misma está dividida en diez solares, dándose la descripción individual de ellos en el mismo asiento en que se tomó razón de la venta.

Sin duda alguna, los terrenos que se proponían aportar los hermanos O'Neill en el año 1926 para urbanizar en unión a los de Alejandro Rodríguez, con el nombre de "Garden City", con un poco menos de cabida, fueron los mismos que compraron al señor Huyke en marzo de 1927. Pero en ninguna época posterior a su compra sometieron nuevo proyecto de urbanización a la Asamblea Municipal de Río Piedras, ni a ningún otro organismo, ni inscribieron en el Registro terrenos que ellos hubieran urbanizado bajo el nombre de "Urbanización Garden City." —Véase Exhibit 7, demandados.

Transcurrieron más de cuatro años desde la aprobación de aquel plano sin que los hermanos O'Neill hubiesen empezado los trabajos y obras en el mismo proyectados. En esa situación, el 11 de abril de 1931 se aprueba la Ley Núm. 11 "para fijar un procedimiento permanente para la urbanización de terrenos de las ciudades y pueblos de la isla." En su artículo 11 "se deroga y deja sin efecto la Ley No. 69... aprobada el 3 de agosto de 1925." En el "Disponiéndose" de su artículo 4 se proveyó:

" . . . Disponiéndose, que toda urbanización o parte de urbanización aprobada con anterioridad a la vigencia de la presente Ley, deberá terminarse dentro del plazo de un año, a contar de la fecha de la aprobación de esta Ley. *Si transcurrieren los términos de un año y dos años anteriormente señalados, y la urbanización no quedare terminada, el permiso quedará anulado y sin efecto alguno."*—Énfasis suplido.

Después de la aprobación de esta ley, los hermanos O'Neill jamás comenzaron, ni intentaron comenzar, los trabajos y obras diseñados en el plano aprobado por la Asamblea Municipal de Río Piedras y por el Departamento Insular de Sani-

dad en el año 1926 para la construcción de la urbanización "Garden City." Así, a partir del 11 de abril de 1932, quedaron anulados y sin efecto los permisos concedidos por esos dos organismos para construirla. ■

Si bien se proyectó la construcción de la urbanización "Garden City" en el año 1926 y se obtuvo la aprobación del plano, nunca se inició su construcción. No podía, "aprobarse definitivamente" por el gobierno insular y por el municipio de Río Piedras una urbanización que jamás se construyó; ni podían conservarse ni convertirse en propiedad del municipio calles que nunca se construyeron. ■

Por la simple aprobación de un plano no podía entenderse que los terrenos que se ofrecían para calles, según éstas aparecían dibujadas en ese plano, pasarían a ser propiedad del municipio de Río Piedras, y, con mayor razón, cuando los supuestos urbanizadores carecían de título escrito sobre esos terrenos y cuando, después de esa aprobación, se otorga el título de su adquisición dividiéndolos totalmente en diez solares muy diferentes a los diecinueve solares del plano de 1926, eliminándose de la descripción general de la parcela y de las descripciones individuales de los solares, la dibujada "Calle No. 5." ■

A la fecha de la aprobación del plano, en lo pertinente, disponía la Ley Núm. 69 de 1925:

"Una vez *aprobada definitivamente* por el Gobierno Insular y por el Municipio una urbanización, se entenderá que ésta entra a formar parte de la urbe, y la conservación de sus calles y demás servicios públicos quedan a cargo y serán propiedad del municipio correspondiente."—Énfasis suplido. ■

La aprobación definitiva no puede tener lugar en relación con urbanizaciones planeadas pero no construidas. No puede entenderse aprobada definitivamente la construcción de una urbanización cuando ni un solo metro de terreno se ha urbanizado. Como exponen acertadamente en su alegato los recurrentes: "Con excepción de la Calle O'Neill, la urbani-

zación Garden City nunca pasó de la aprobación previa del plano. . .";(⁶) en otras palabras, jamás se extendió más allá de los permisos inexcusables para empezar a construirse. ▆

La Ley Núm. 213 de 1942, que creó la Junta de Planificación—aprobada tres años antes de comprar la demandante a los hermanos O'Neill parte de los terrenos de éstos—en parte de su artículo 11 dispone que la preparación o la adopción de un mapa oficial "no determinará de por sí la construcción de ninguna carretera o calle, ni la expropiación o aceptación de terrenos para tales fines de carreteras o calles. El Reglamento Núm. 3 de la Junta, vigente desde el 4 de septiembre de 1944—fecha también anterior a la indicada compra— en su artículo 20 dispone que las calles de urbanizaciones tendrían "status legal de calles públicas" y pasarían a ser propiedad pública "después que los Planos de Inscrip-

---

(⁶) Resolviendo sobre la obligación de un urbanizador de dotar de pavimentos con superficie asfáltica, aceras, encintados y cunetas a unas calles que desde 1928 estaban urbanizadas, dijimos en *Zayas* v. *Junta de Planificación*, 69 D.P.R. 30, 35 (1948):

"En cuanto a la segunda parte de este señalamiento en el que se alega que se cometió error al exigir facilidades mínimas para las calles 1, 2, 3, y 4, convenimos con el recurrente y opinamos que la Junta no está facultada para hacer tales requerimientos. Dichas calles fueron urbanizadas y aceptadas como tal por el Gobierno Municipal de Adjuntas desde el año 1928. A partir de esa fecha, el recurrente no tenía control o dominio alguno sobre dichas calles. Así lo demuestra una cerificación que forma parte de los autos, expedida por el secretario municipal del mencionado pueblo en el año 1928 al efecto de que: 'La Asamblea por unanimidad acuerda aceptar y recibir finalmente la urbanización del Lic. Zayas Pizarro, denominada La Granja, sita en el barrio Pueblo de Adjuntas, extremo Este de la Calle Rodulfo González, *en cuanto a las cuatro calles que ya tiene terminadas*, las cuales calles por la presente pasan a formar parte de la urbe o zona urbana de acuerdo con la Ley, pudiendo dicho interesado proceder a la construcción de las casas que crea conveniente en las referidas cuatro calles, previa aceptación final del Departamento de Sanidad y los permisos que exigen las leyes y reglamentos sobre la materia para tales construcciones.' Aparece también una carta oficial expedida por el Departamento de Sanidad en el año 1928, la cual en su parte pertinente dice así: '*Después de una inspección* hecha por el Ingeniero Auxiliar, Sr. Oliver, a los terrenos de la urbanización de su propiedad, sita en la jurisdicción de Adjuntas, me es grato

ción hayan sido aprobados y registrados *y se hayan terminado todas las calles y demás obras de urbanización."* —Enfasis suplido.

En *Benet* v. *Registrador*, 65 D.P.R. 489, 494 (1945), aplicamos el artículo 11 de la Ley 213, y resolvimos que un informe aprobado por la Junta de Planificación autorizando unas lotificaciones, en el que constara que un Plano Regulador de Vías Públicas por ella adoptado incluía una vía que se proyectaba pasar por ciertos solares no constituía título de servidumbre de paso ni tenía el efecto de crear un derecho de servidumbre que pudiera ser objeto de mención en el registro al inscribirse las lotificaciones.

Por lo expuesto, las conclusiones de hecho números 4, 5, 6 y 7 y las de derecho consecuentes a ellas, ([7]) resultan claramente erróneas.

Consideramos correcta la conclusión de hecho número 8, en la que se determina que la urbanización Garden City "según el plano de urbanización, se componía de las siguientes manzanas, solares y calles:..." Una simple ojeada al desechado plano de 1926—Exhibit 3, demandante—comprueba que es cierto que "según el plano" la urbanización allí proyectada "se componía" de manzanas, calles y solares mencionados en esa conclusión. Esta no es nada más que una mera referencia al plano de 1926, no la determinación directa ni indirecta de que esa urbanización fue realmente construida.

manifestarle que habiendo sido las calles Núms. 1, 2, 3 y 4 *afirmadas y construidas de acuerdo con los planos aprobados* por este Departamento, por la presente se aceptan dichas calles para los fines de edificacion en las mismas.' "—Enfasis suplido.

Podemos afirmar que con arreglo a la Ley Núm. 69 tal como allí parcialmente la interpretamos, para que se entendiera que una urbanización entrara a formar parte de una urbe y que sus calles pasaran a ser propiedad del municipio correspondiente, se requería: (a) la previa aprobación del plano por la Asamblea Municipal y por el Departamento Insular de Sanidad; (b) construcción y terminación de las calles conforme con dicho plano; (c) comprobación de que tales calles fueron construidas y terminadas con arreglo a dicho plano por el personal del "Gobierno Insular y del Municipio" y (d) aprobación final por ambos gobiernos.

([7]) El tribunal a quo no enumeró sus conclusiones de derecho.

La número 9, que señala la longitud y el ancho de la proyectada calle número 5, es claramente errónea. Según su dibujo en el plano su longitud sería 61.51 metros, no 63.30 metros como afirmó el juez de instancia en esa conclusión; su ancho total, incluyendo los espacios para aceras, sería de 10 metros, no de 13 metros como señaló dicho juez, atribuyendo aparentemente 10 metros a su zona de tráfico rodante, y "1.50 metros a cada lado para aceras." Su área sería de 615.10 metros cuadrados tal como lo dice el plano, no de los 822.90 que resultan de las medidas fijadas en la conclusión. —Obsérvese la "Sección Transversal de las Calles" dibujada al lado izquierdo del plano y véase la carta del Sr. Rexach, inserta en el escolio 5.

## II

Los señalamientos de errores sexto, séptimo, octavo, noveno y décimo impugnan las conclusiones de hecho números 10, 11, 12, 18, 19 y 21 y la de derecho correspondiente, que dicen así:

"10. Desde el año 1928 los demandados arrendaron para su construcción de casas los cuatro solares de la manzana 'D' con sus frentes a la calle núm. 5.

"11. Los arrendatarios de solares de la manzana 'D' construyeron en cada uno de dichos solares casas de madera, teniendo algunas de ellas zócalos y escaleras de hormigón así como servicio público o de acueducto y alumbrado.

"12. Si bien dichas casas fueron construidas dentro de los solares arrendados de la manzana 'D' no se construyeron guardando la línea de la calle Núm. 5, sino alineados irregularmente pero con su frente a la dicha calle.

"18. Los demandados solicitaron de la Junta de Planificación la lotificación de su finca Núm. 4996 a los efectos del solar segregado para la demandante y la dicha Junta, mediante informe L-692 de fecha marzo 8 de 1946 aprobó la segregación y para su inscripción en el Registro de la Propiedad describió el solar adquirido por la demandante de la manera siguiente:

"URBANA: Parcela de terreno compuesta de 1465.22 metros cuadrados en lindes: por el norte en 36.90 metros con la calle Núm. 5; por el sur en 37.50 metros con la calle O'Neill

(antes calle Núm. 1) ; por el este en 38.50 metros con la finca principal, y por el oeste en 40.50 metros con la calle Núm. 4.

"19. Si bien el solar de 1465.22 metros cuadrados adquirido por la demandante se formó con parte de los solares 4 y 5 así como con la totalidad de los solares 6, 7, 8, 9 y 10 de la manzana 'B' de la urbanización 'Garden City', los demandados aceptaron y confirmaron la existencia de dicha urbanización al fijar como colindancias del solar vendido las calles Núm. 5, 4 y O'Neill que conjuntamente con la calle Núm. 6 forman las colindancias de la manzana 'B'.

.      .      .      .      .      .      .      .

"El día 27 del mes de junio de 1945, fecha de la adquisición por la demandante de su solar, los terrenos de las calles de la urbanización Garden City eran propiedad municipal. Las calles Núms. 5 y 6  así como la calle O'Neill estaban abiertas al tránsito público. En todos los solares de la manzana letra 'D' se habían construido casas con sus frentes a la calle Núm. 5, por lo que, entiende el tribunal, que la dicha calle Núm. 5 estaba urbanizada a la fecha de la adquisición por la demandante de su solar. Sabido es que para que exista una calle con derecho a ser usada por los compradores de solares, de acuerdo con un plano de urbanización que las traza y las deja sobre el terreno a su libre uso y del público, no es requisito, ni necesario, que dichas calles estén asfaltadas o que tengan cunetas y aceras, bastando que exista el terreno y que sea utilizado como calle por los compradores de solares. (Véase lo resuelto por nuestra Suprema Corte en *Capella* v. *Carreras,* 57 D.P.R. 264.) ."

La prueba, considerada en conjunto, no sostiene, en lo fundamental, esas conclusiones. Demostró que después del ciclón de San Felipe se empezó a construir y se construyó un pequeño arrabal formado por un grupo de unas cinco o seis casas de madera en la parte norte de la parcela de los hermanos O'Neill, ocupando esas casas porciones de los solares que según el plano de 1926 formarían la "Manzana D" de la proyectada urbanización, o porciones de los diez solares en que se dividió la parcela de ellos al adquirirla en el 1927; no se construyeron guardando líneas de construcción; algunas de ellas tenían zócalos y escaleras de hormigón; la ocupación de

la parcela de ellos por estas personas se debió en principio a las relaciones previas existentes entre ellas y la familia O'Neill que consintió y toleró después de los ciclones de San Felipe y San Ciprián que gente pobre con sus casas ocupara parte de la parcela como "sitio para refugiarse." Los demandados cobraban mensualmente a algunos de los dueños de esas casas pequeñas cantidades por tenerlas en sus terrenos; poco después de vendérsele el solar a la demandante todas esas casas, con la ayuda económica de los hermanos O'Neill, habían sido trasladadas de la parcela a otros terrenos; los servicios de agua—una pluma de agua—y de alumbrado de que disponía ese pequeño arrabal habían sido llevados allí por gestiones de los dueños de esas casas; parte de una de esas casas, su letrina y un palomar, propiedad todo de Guillermo Martínez, había sido precisamente construido dentro de la faja de terreno que hubiera sido la calle número 5 de haberse construido la urbanización Garden City—véase la fotografía Exhibit I de la parte demandada;—los hermanos O'Neill hasta la fecha de la venta a la demandante no habían hecho obra alguna de urbanización en su parcela; ni las llamadas calles se habían trazado sobre el terreno; la parte de la parcela no ocupada por las casas estaba sembrada de árboles frutales, matas de guineos y contenía bastante vegetación—véanse en cuanto a los árboles desarrollados las fotografías, Exhibit 8a, 8b y 8c, y 9a, 9b y 9c, parte demandante—; se habían formado varias veredas que conectaban las casas entre sí y servían para el tránsito a pie desde el mencionado caserío hasta la calle O'Neill, pasando sobre los terrenos que después en el año 1945, se vendieron a la demandante; en gran parte esa parcela de los hermanos O'Neill estaba formada por un terreno pantanoso que daba lugar a la formación de pequeños charcos o depósitos de agua sobre los cuales los dueños de esas pequeñas casas y sus familiares habían tendido tablones para mantener ese tránsito entre el grupo de casas y la calle O'Neill; las casas no se construyeron frente a calle alguna debido a

que su construcción no se hizo siguiendo el desechado plano de 1926, ni como cuestión de hecho existían las calles 5 y 6 que habían sido dibujadas en ese plano, sino las indicadas veredas. La calle llamada número 4 fue hecha después del 4 de agosto de 1949 por los vecinos Isabel Piñeiro de Olivar, Monserrate Rosa y Diego Domínguez. El sitio de viraje que muestra la fotografía Exhibit 1 de la parte demandada fue hecho también por estos vecinos.

Esos hechos jamás podían constituir apropiados supuestos para concluir (1) la existencia de tales calles, (2) que éstas "eran propiedad municipal," (3) que estaban abiertas al tránsito público, (4) que en todos los solares de la manzana 'D' se habían construido casas con sus frentes a la dibujada calle número 5.

Nuestra decisión en *Capella v. Carreras*, 57 D.P.R. 258 (1940), citada por el juez sentenciador, no tiene aplicación al presente caso. Allí se trataba de una demanda sobre perturbación del derecho a transitar por una calle realmente existente que formaba parte de una urbanización que efectivamente se desarrolló conforme a un plan de urbanización y que utilizaban varios vecinos compradores de solares de esa urbanización. Véanse los hechos de ese caso tal como fueron expuestos en *Capella v. Carreras*, 48 D.P.R. 830, 834 (1935), en donde, entre otras cosas, dijimos:

"Hay prueba en los autos tendente a demostrar que la propiedad fue urbanizada, sus calles dedicadas al uso público y entregadas al Municipio de San Juan."

La existencia prolongada de aquel pequeño arrabal, la falta del trazado de calles, la presencia de letrinas y palomares y de parte de una casa dentro de la faja que una vez se dibujó en un plano como calle número 5, constituyen una clara demostración de que la proyectada urbanización de la parcela de los hermanos O'Neill jamás se desarrolló. Esas circunstancias justificaban plenamente una determinación negativa de la existencia de la llamada "Calle Número 5."

La situación registral de aquella parcela al día 27 de junio de 1945, según resulta del Exhibit Núm. 7 de los demandados—formado por una solicitud de certificación dirigida al Registrador de la Propiedad y la certificación librada al efecto—era la siguiente: que en esa fecha, y desde antes de ella, la finca aparecía en el Registro "dividida en diez solares marcados del Uno al Diez inclusive y separadamente inscritos en dicha primera inscripción" y que no aparecía "dicha finca identificada con el nombre de Garden City ni con ningún otro nombre y que no aparece dividida en manzanas o calles."

En ese día se otorga por los hermanos O'Neill y sus respectivas esposas y la demandante la escritura número 11, sobre "Reagrupación y Compraventa de Terreno", ante el notario Rafael R. Fuertes. En su parte expositiva manifestaron los primeros que eran dueños de la parcela de 5927 metros cuadrados, dándose a esa finca la misma primitiva descripción general que se le había dado al adquirirla los hermanos O'Neill en marzo de 1927 y que aparece a la página 17 que antecede. Se hace constar que la misma estaba dividida en los diez solares a que se refiere la certificación registral aludida. Los hermanos O'Neill proceden en el documento a dejar sin efecto la anterior división de la parcela en diez solares y a reagruparlos en los siguientes términos:

"REAGRUPACIÓN DE TERRENOS.

"CUARTO: Continúan manifestando don Luis O'Neill de Milán y doña Josefa Calzada, el primero en su carácter personal y representativo y la segunda por su propio derecho, *que interesan dejar sin efecto la división de la parcela de terreno anteriormente descrita en los solares en que ha sido dividida,* interesando reagruparlos todos para formar una finca cuya descripción es la siguiente:"—sigue aquí la misma descripción primitiva del año 1927 con muy poca variación.—Énfasis suplido. ■

Luego de hecha la reagrupación de esos diez solares que se extendían desde la misma colindancia sur de la parcela, o sea desde la calle O'Neill hasta la misma colindancia norte,

sin existir dentro de ellos calles algunas, (y que no deben confundirse en forma alguna con los 19 solares del anulado plano de 1926), los hermanos O'Neill segregaron de la parcela formada por esa agrupación un solar de 1465.22 metros cuadrados que por el mismo documento vendieron a la demandante y cuya colindancia norte se daba así: "por el norte en treintiséis metros con noventa centímetros con la calle número cinco en proyecto de esta urbanización, . . ." cuando en realidad era la finca principal. Y así, impropiamente, por falta del debido cuidado en la descripción del solar segregado y por repetir expresiones incorrectas de la primitiva descripción de la finca principal, que no se describió después de la segregación, se dio pie a lo que ocho años después constituyó el motivo del presente litigio. Decimos impropiamente porque, para el año de 1945 ni existía la calle número cinco en proyecto, ni existía lo que allí se llamaba "esta urbanización", según se desprende de la prueba aportada. Esas calles aparecían en el plano de 1926 como se dijo en la propia escritura, pero sin que se hiciera constar que ese plano había quedado anulado por la Ley Núm. 11 de 1931, y, antes de esa ley, por haberse dividido la finca por su anterior dueño Sr. Huyke en los distintos diez solares, según el Registro, sin que de esta nueva división posterior al plano mencionado, apareciera ni la calle número cinco ni el nombre de la urbanización Garden City. Ni esa Ley de 1931, ni el estado registral al 27 de junio de 1945, podían ignorar los otorgantes ni el notario que autorizó el documento.(⁸) La demandante tomó posesión del solar

---

(⁸) Con mucha razón, a juicio nuestro, se le atribuyó ese error al notario que autorizó el documento de reagrupación, segregación y compraventa. Uno de los distinguidos letrados de la demandante, al discutirse la admisión de una certificación del Registro de la Propiedad, en torno a ese lamentable error, espontáneamente, durante el juicio, se expresó así:

"Ahora, *ahí se cometió un error,—porque es un error en honor a la verdad—es un error, a mi juicio, del notario* haber hecho constar, a menos que fuera para los fines de identificación, de haber hecho constar que esa parcela colindaba al norte con la calle tal (la calle Núm. 5) y al sur

de 1465.22 metros cuadrados y construyó en 1946 su edificio para taller de costura con salidas libres y amplias hacia la calle O'Neill, por el sur y hacia lo que después se convirtió en la llamada calle cuatro, por el oeste. Hasta el año 1953 la situación de la proyectada calle número cinco era la misma: ni se había trazado sobre el terreno, ni se había abierto al público y seguían localizadas en ella parte de la casa, la letrina y el palomar de Guillermo Martínez. La demandante hasta entonces, o sea por espacio de ocho años, no había pedido a los hermanos O'Neill que trazaran, construyeran y abrieran al tránsito público la proyectada calle número cinco, ni que eliminaran los obstáculos puestos en ella por Guillermo Martínez.(⁹) Tampoco ella la usó como entrada y salida de su propiedad.

En 1949 se efectúan conversaciones entre la señora Goenaga y el codemandado Luis O'Neill sobre la compra de unos

con la calle tal en proyecto, *porque no existía en la escritura ninguna división de esa parcela grande en calles y solares*. Su Señoría sabe que para ser lógica la parcela grande ha debido ser dividida en manzanas y calles y solares, *pero no aparece de esa escritura que la parcela grande haya sido dividida en manzanas y calles y solares*. Luego, entonces, la parcela segregada no podía estar dividida en manzanas y calles y solares. Eso no existía a los fines de esa escritura, y ésa es la parte jurídica." (T.E.—por taq. Salas, pág. 46.)

El error en la fijación de la colindancia norte se repite al otorgarse por las partes un acta aclaratoria, ante el mismo notario, el 6 de julio siguiente, a los fines de hacer constar que al autorizar la Junta de Planificación la segregación impuso la condición que se inserta en esa acta aclaratoria que prohibía edificar a distancia menor de cuatro metros del "actual encintado, al Norte de la Calle O'Neill."

Y volvió a repetirse al redactarse en 1946 el informe de esa Junta de Planificación, en el cual se dice que ese solar segregado colindaba "por el Norte en 36.90 metros con la Calle Núm. 5;"—Exhibit 6, demandante.—Según aparece del Exhibit 12 de la demandante, el error se debió a que la Junta tomó de esas escrituras la descripción de la parcela segregada.

(⁹) La conclusión de hecho número 25, en parte, dice: " . . . habiendo observado el tribunal, en su inspección ocular que en parte del terreno destinado para la calle Núm. 5 y cerca de su intersección con la calle Núm. 4 existían las ruinas de una letrina de la casa de Guillermo Martínez, construida la nombrada casa en los terrenos del solar de la demandante a la fecha en que ella lo adquirió."

metros de terreno adicionales. El 18 de julio de ese año ella le escribe una carta que dice así:

"Apreciado Luis:

"Hoy recibí tu carta de julio 7. Esta semana estoy exageradamente ocupada con un asunto que tengo del 'income tax' insular y otro con el 'income tax federal' pero en la próxima semana podemos hacer medir el terreno el día y hora que a ti mejor te convenga. Déjame saber con anticipación el día y hora para así yo hablarle a alguien que esté con la persona que tú envíes; puedes estar seguro que se medirá de acuerdo con tu carta.

"Mil gracias por estar dispuesto a venderme los metros que intereso. Ya tú me avisarás para ponernos de acuerdo.

"Luis, tú sabes que yo siempre he estado interesada en tus terrenos y que si no los compré cuando me hiciste la venta del que tengo fue porque a tu esposa Pepita le interesó retener esos terrenos para ustedes y unos familiares; por lo tanto te agradecería me dieras la primera opción para comprarte; bien sabes que tú y yo siempre hemos podido ponernos de acuerdo. Yo sentiría mucho tener otros vecinos que no fueran ustedes, ya que me había hecho la ilusión que ustedes vivirían al lado nuestro algún día.

"No voy hoy a verte personalmente porque el tiempo no me da para todo lo que tengo que hacer; ya tú comprenderás lo ocupada y preocupada que estoy; así es que confío en nuestra amistad que me darás una oportunidad.

"Con mis saludos para Pepita, tus hijas y para ti, recibe el aprecio sincero de (fdo.) Conchita Goenaga."

No obstante mencionarse la venta del solar, y no obstante haberle anunciado por carta del 7 del mismo mes de julio de 1949 que estaba "pensando poner a la venta el solar contiguo al que tú nos compraste"—Exhibit 15, demandante— nada le dice respecto al trazado, apertura y uso de la proyectada calle número cinco.

### III

El undécimo señalamiento plantea la incorrección de la conclusión número 22 que es como sigue:

"Los demandados, como incentivo para la venta del solar y al hacer la oferta de venta a la demandante, le mostraron el plano de la urbanización Garden City aprobado por el Departamento de Sanidad de Puerto Rico el día 12 de noviembre de 1926, y la demandante inducida por la urbanización diseñada en dicho plano, y creyendo y confiada en que las calles serían construidas, compró el solar."

Realmente, la evidencia, considerada en conjunto, aun del modo más favorable a la demandante recurrida, no sostiene la anterior conclusión. Desde antes de efectuarse la venta ella conocía los terrenos de los hermanos O'Neill; siempre estuvo interesada en ellos, según ella hizo constar en la carta del 18 de julio de 1949 que le envió al codemandado Luis O'Neill y en la que también hizo constar que no adquirió toda la parcela porque los hermanos O'Neill decidieron retener el remanente para ellos y sus familiares. —Exhibit 9, demandante.— El remanente, incluía, desde luego, la faja dibujada en el plano de 1926, que hubiera sido la calle número 5.

Para fines del año 1944 ya la señora Goenaga tenía un bachillerato en ciencias y había sido profesora de la escuela superior de la Universidad de Puerto Rico. Para esa época estaban en vigor la Ley Núm. 213 de 12 de mayo de 1942 y el Reglamento Núm. 3, que hacían inexcusable la intervención de la Junta de Planificación en las urbanizaciones, lotificaciones y edificaciones y que requería la inscripción, archivo y registro de todo plano de urbanización. El Registro de la Propiedad le indicaba que la parcela de los hermanos O'Neill no había sido dividida en manzanas y calles, ni en los diecinueve solares dibujados en el plano de 1926, sino en los diez solares que se describían en ese Registro y la escritura de venta otorgada en 1927 por el señor Huyke a favor de los hermanos O'Neill, y que el plano de 1926 no estaba inscrito. Para esa época hacía mucho tiempo que por virtud de la Ley Núm. 11 de 1931 la aprobación municipal y la departamental del plano de 1926 habían perdido su eficacia y validez, y eran

necesarios nuevos planos, requisitos, permisos y autorizaciones para hacer lotificaciones urbanas.

De la prueba se desprende que el día 6 de noviembre de 1944 los hermanos O'Neill concedieron una opción de compra a la señora Goenaga sobre una porción de 1657.72 metros cuadrados de la parcela de ellos. En el plano de 1926 esa porción correspondía a los solares de la Manzana "B" señalados con los números 4, 5, 6, 7, 8, 9 y 10, según la referencia que se hizo en la opción de ese plano. La opción venció el 6 de enero de 1945 sin que la señora Goenaga comprara la porción de terreno objeto de la misma. No obstante ello, a petición de ella, los hermanos O'Neill prorrogan el plazo de la opción por 60 días, o sea hasta el 7 de marzo de 1945. —Exhibit 14, demandante.— Vence la prórroga y tampoco adquiere la señora Goenaga.

Posteriormente insiste la señora Goenaga en comprarles. Pero entonces los hermanos O'Neill no están dispuestos a vender los 1657.72 metros cuadrados objeto de la caducada opción. Solamente le vendían una porción de 1465.22 metros cuadrados, es decir, 192.50 metros cuadrados menos, y esta nueva parcela—que nunca figuró en el plano de 1926—fue la que finalmente compró. Explicando ella porqué fue que compró una parcela con un área diferente, dijo:

"R. Cuando yo fui a hacer la compra de todos los solares desde el 4 hasta el 10 inclusive, el señor Luis O'Neill se me negó a venderme la totalidad del terreno de los solares 4 y 5. Quedaba un solar que según él serían 6.25 metros lineales por el Norte y por el Sur. Entonces, yo le aclaré de la opción que teníamos y que él por la misma venía obligado a venderme en su totalidad los solares 4 y 5 igual que todos los demás del 6 al 10. Me dijo que no, que él no lo vendía, que tenía que ir a la corte con él, llevarlo a la corte si yo quería. En esa discusión, yo que me lo tenía que vender los solares 4 y 5 en su totalidad y él que no me vendía estuvimos en esa discusión desde que yo fui a comprar hasta que se firmó la escritura el 27 de junio de 1945, porque yo admití ya que a nosotros nos unía una amistad de muchos años por no tener más discrepancias

y tampoco ir a la corte decidí ceder y comprar solamente lo que el señor O'Neill me quería vender de los solares 4 y 5, 6.25 metros lineales por el Norte y el Sur. Entonces, al hacer la escritura que yo fui a firmar la escritura. . . . " (T.E., págs. 23 y 24.)

En el acto del otorgamiento de la escritura de compra, el plano de 1926 no fue mostrado a la señora Goenaga, a pesar de que en la nueva parcela que adquiría no estaban incluidas las áreas totales de los solares 4 y 5 de la Manzana "B" del plano. De la transcripción de evidencia tomamos lo que sigue:

"Testigo, usted ha dicho que cuando usted fue a otorgar la escritura a firmar la escritura usted hizo unas manifestaciones porque notó que no se indicaban los solares en la escritura que no se relacionaban los solares relacionados con la opción, ¿dijo usted eso? Le quiero preguntar a usted si cuando usted firmó la escritura usted tenía el plano de esa alegada urbanización, ¿los tenían presentes?

"R. Lo tenía el señor Luis O'Neill que fue el que me enseñó el plano a mí.

"P. Al firmar la escritura estaba el plano presente cuando se fue a otorgar la escritura?

"R. No recuerdo. Pero no lo necesito. Yo tengo bastante buena memoria.

"P. Le pregunto si al ir usted a firmar la escritura y notar usted que no se había incluido determinados solares marcado o relacionado, ¿le pregunto si en ese momento usted tenía el plano allí o no de lo que estaba comprando?

"R. Yo no le tenía conmigo.

"P. Y el notario lo tenía?

"R. No sé si él lo tendría en su escritorio o no.

"P. En el acto de firmar usted lo vio?

"R. En el momento no. Ya yo había visto el plano. Lo había estudiado cuando hice la opción de compra. En ese momento él sí tenía el plano de él.

"P. Usted no tuvo el plano delante en el momento del otorgamiento?

"R. No lo necesitaba. Antes de esa opción yo tuve otra opción cuando el contrato . . .

"P. ¿Si tenía el plano presente?... No es responsiva la contestación a la pregunta mía.

"Juez:

"La testigo contestó que no recuerda si tuvo el plano porque el día no lo vio.

"R. Yo no lo tenía conmigo. Ese plano pertenecía al señor Luis O'Neill. Me imagino que él lo tendría. Yo no lo necesitaba porque yo sabía lo que iba a comprar." (T.E. 42–44, taq. Cruz Cabrera.)

Al declarar el codemandado Luis O'Neill respecto al motivo que se tuvo para hacerse referencia al plano de 1926, y dar como colindancia Norte la inexistente calle Núm. 5, su explicación coincidió con la hipótesis apuntada por uno de los abogados de ella cuando este letrado explicaba las posibles razones para el error de dar esa calle como colindancia norte. Declaró, respecto a esta cuestión, el señor O'Neill:

"P. ¿Verdad? Bueno, ahora la pregunta es ¿por qué el hacer usted la segregación de esa parcela se refiere usted, al fijar las colindancias de la parcela que ustedes le vendieron a doña Conchita, por qué al fijar las colindancias se mencionan algunas calles de la urbanización, como, por ejemplo, calle número cinco?

"R. Por la misma razón quería yo insertar todo eso ahí, que es el plano con calles . . .

"P. ¿Por qué razón?

"R. Se lo estoy diciendo; se la dije ya. La razón por la cual yo quise insertar esa descripción metida en un plano que dije yo a la corte, fue por la razón de que haciéndolo así se llamaba la atención de la Junta de Planificación de que ese plano había existido, un plano aprobado por el Departamento de Sanidad; y, además, servía en su día, si había una disputa sobre esa cosa, para localizarse sin necesidad de mayor trabajo, como estaba este asunto." (T.E. pág. 220, taq. Salas.)

Sin duda alguna el plano de 1926 le fue mostrado a la señora Goenaga alguna vez antes de convenirse finalmente la compra. Ella declaró: "Me mostraron un plano al hacerme la oferta de venta." (T.E. pág. 138, taq. Clavell.) La opción para comprar los siete solares de la Manzana "B" le

fue concedida, como ya expusimos, el 6 de noviembre de 1944 y la compra se realizó siete meses después, respecto a una parcela de distinta cabida y sin que ella necesitara, como declaró, del plano para saber lo que adquiría.

Ella no declaró que le demostraron el plano "como incentivo para la venta," ni que para comprar fue "inducida por la urbanización diseñada en dicho plano"; ni tampoco declaró, ni de su testimonio se desprende, que compró el solar "creyendo y confiada en que las calles serían construidas"; tampoco declaró que los hermanos O'Neill se comprometieron a construir la calle Núm. 5; ni en su demanda enmendada así lo alegó.   Sin embargo, en el antiguo plano que se le demostró a fines de 1944 claramente aparecía la fecha en que se había preparado: "Septiembre 14, 1926", y la de su aprobación por la Asamblea Municipal de Río Piedras: "siete de octubre de 1926."

## IV

Los señalamientos duodécimo y decimotercero se refieren a las conclusiones de hecho números 23 y 24, mediante las cuales determinó el tribunal de instancia, en lo esencial, que al comprar la demandante el solar los ocupantes del pequeño arrabal y las personas que frecuentaban dichas viviendas utilizaban como camino de entrada y salida el terreno destinado para la calle número 5 y "con dicho uso y tránsito el terreno de la calle número 5 estaba firme, formando un camino o vereda irregular" y era aun perceptible a la fecha de la inspección ocular pasando por frente a las ruinas de las casas que existían en los solares "así como al frente y a todo lo largo del lado norte del solar comprado por la demandante."

Aquí también concedemos la razón a los recurrentes.   No concebimos cómo puede concluirse que una calle de 63.90 metros de longitud por 13 metros de ancho existe y está afirmada a base de que por el mismo terreno discurría una pequeña vereda, caminito o trillo como dijeron algunos testigos, de unas doce o dieciocho *pulgadas* de ancho, de forma irregu-

lar, formada por el paso constante de los residentes del pequeño arrabal para entrar y salir de sus casas y por las personas del público que podían visitarlas. Por otra parte, la prueba demuestra que esa vereda no discurría toda por dentro de la proyectada calle número 5, y sólo en algún punto tocaba parte de esa faja de terreno. Según el plano del año 1926—Exhibit 3, demandante—la distancia promedio entre la línea norte de la proyectada calle número 5 y la colindancia norte de la parcela de los hermanos O'Neill que es una muralla de concreto, o sea del fondo de la Manzana "D", eran unos 19.82 metros. En el acta de la inspección ocular, entre otras cosas, hizo constar el juez sentenciador: " . . . el Sr. Carlos Figueroa, delineante, midió desde la muralla o sea desde la colindancia Norte de los terrenos de los Sres. O'Neill, 15 metros hasta la veredita." Si, según el plano, desde la muralla hasta la calle número 5 hay una distancia promedio de 19.82 metros, y si según el acta de la inspección ocular la "veredita" está solamente a 15 metros de la muralla, es decir, que entre esa "veredita" y el borde o línea norte de la proyectada calle número 5 existía una franja de 4.82 metros de ancho, es imposible concluir (1) que debido al uso y tránsito por esa "veredita" estaba firme esa calle, y (2) que esa "veredita" fuera perceptible "pasando : . . al frente y a todo lo largo del lado norte del solar comprado por la demandante." (⁹ᵃ)

El paso de los residentes del arrabal por sus terrenos y del público que los visitaban fue un acto transitorio y meramente

---

[9a] Al formular esta conclusión, el tribunal a quo, sin aparente razón, rechazó el testimonio no contradicho del ingeniero Noel Piñero, quien al interrogársele: ¿Usted puede decirle a la corte si esta veredita que se ve aquí en esta fotografía cae dentro de los solares de los señores O'Neill, o si eso cae dentro de la zona destinada en el plano para la calle número cinco? contestó:

"R. Bueno, yo podría asegurar que donde comienza el camino o donde comenzaba esa vereda en la parte norte hasta donde llegaban las casas, en ninguna cae en el camino número cinco. Probablemente, y lo quiero decir con honradez integral, probablemente desde la casita esta aquí adonde salía acá en una forma también errática, pues, quizás en algún punto donde salía, tocaba parte de la calle, pero sí puedo asegurar que esta parte por el norte no formaba parte." (T.E., pág. 80.)

tolerado por los hermanos O'Neill. Ni la propia existencia del arrabal ni el uso de esos terrenos fueron permanentes. Con la remoción de esas pequeñas casas se terminó el tránsito, según indican gran parte de las fotografías admitidas. Los abogados de la demandante en escrito radicado el 2 de junio de 1961, lo admiten así al decir:

"Porque en el año 1953, fecha de la radicación de la demanda, ya se habían destruido todas las casas de la calle No. 5 y por tanto, los ocupantes de dichas propiedades no transitaban por dicho terreno, circunstancia adicional por la cual el testigo no encontró en el año 1959 vestigios de la Calle No. 5." ■

Aun asumiendo la corrección de esas conclusiones de hecho, es decir, que toda aquella faja de 615.10 metros cuadrados dibujada en el plano de 1926 con el nombre de "Calle No. 5" había sido usada por esos residentes y las personas que los visitaban con el consentimiento de los hermanos O'Neill, no puede determinarse en derecho que se había creado un derecho real de servidumbre de paso sobre esa faja y a favor del solar vendido a la demandante. En numerosas ocasiones hemos resuelto que el mero permiso concedido por un propietario para pasar sobre su finca o su tolerancia del paso, no son bastantes para dejar establecida una servidumbre de paso que sólo puede adquirirse en virtud de título.[10] ■

Tampoco podía con la prueba presentada, determinarse que sin duda alguna hubo o se produjo una consagración implícita de terreno para uso general público por actuaciones y conducta específicas de los hermanos O'Neill y que los hubiera colocado en situación de impedirles negar esa consagración. Fuera del hecho de haber ellos tolerado por algún tiempo el paso por sus terrenos, no hemos encontrado en los autos una sola actuación de ellos que revele la intención espe-

---

[10] *Martín* v. *Correa*, 76 D.P.R. 12, 14 (1954); *Pabón* v. *Ayala*, 71 D.P.R. 938, 941 (1950); *Figueroa* v. *Guerra*, 69 D.P.R. 607, 610 (1949); *Cabanillas* v. *Gelpí*, 65 D.P.R. 945 (1946) y casos citados a la página 947 de esta última decisión.—Véanse Arts. 283, 391, 392, 475, 476 y 1232 del Código Civil, ed. 1930.

cífica e indubitada de consagrar la faja de terreno, dibujada en el plano de 1926 como la calle número 5, para el uso público general, y mucho menos para constituir una servidumbre de paso, luz, aire y vista—como decreta la sentencia—a favor del predio de la señora Goenaga. ▆

Advertimos en el caso de *Figueroa* v. *Guerra*, 69 D.P.R. 607, 612 (1949):

"Sin embargo, la consagración implícita es una doctrina que debe ser aplicada con mucha cautela en esta jurisdicción, donde aun los derechos privados de paso, excepto cuando la prescripción basada en uso desde tiempo inmemorial empezó a correr antes de 1889, pueden crearse bajo el artículo 475 del Código Civil solamente mediante escritura."[11]

En sus conclusiones de derecho hizo constar el tribunal de instancia:

"El solar adquirido por la demandante se inscribió como colindando por el Norte con la Calle Núm. 5, según reza el informe L-692 de marzo 8 de 1946 de Planificación. El tribunal opina y entiende que la faja de terreno destinada por dicha Calle Núm. 5 fue reservada y dedicada para la construcción de una calle o vía pública, adquiriendo el solar de la demandante, a virtud de dicha reserva e inscripción, derechos reales sobre la faja destinada para calle, constituyendo la finca de la demandante el predio dominante y la faja destinada para calle o vía pública el predio sirviente. (Véase reciente resolución de nuestra Corte Suprema en el caso de *Gerardo Baldrich et al.* v. *Registrador de la Propiedad,* resuelto el 29 de diciembre de 1954.)"

Ya hemos dicho que el error de consignar la proyectada calle número 5 como colindancia norte del solar de la demandante se debió, como honrada y espontáneamente consignó uno de sus distinguidos abogados, no a un acto de los hermanos O'Neill, sino a un error del notario que redactó y autorizó la escritura de reagrupación, segregación y compraventa.

---

[11] Véanse los comentarios que aparecen en la Rev. Jur. U.P.R., Volumen 19, págs. 47–58 (1950), en torno a la jurisprudencia, hasta entonces, sobre la materia de consagración.

Del Exhibit 12, de la propia parte demandante, que es una Resolución de la Junta de Planificación de 13 de enero de 1954, resulta que "la descripción de la propiedad adquirida por la peticionaria[Sra. Goenaga] según el informe en el caso 346 lot. ñ fue copiado de la escritura...", en otras palabras, el error cometido por el notario lo repitió la Junta en su informe.

No puede considerar la demandante constituida la servidumbre a favor de su predio porque inscribió en el Registro su escritura de compra en donde se decía que su parcela por su lado norte colindaba con la calle número 5. En primer término, porque, en esa misma escritura, tomando prestadas las palabras de uno de sus abogados dichas "en honor a la verdad":

"...no existía ... ninguna división de esa parcela grande [la formada por reagrupación de los 10 solares del Registro y del título—no del plano de 1926—de 1927 de los hermanos O'Neill] en calles y solares. Su Señoría sabe que para ser lógica la parcela grande ha debido ser dividida en manzanas y calles y solares, pero no aparece de esa escritura que la parcela grande haya sido dividida en manzanas, calles y solares. Luego, entonces, la parcela segregada no podía estar dividida, [sic] en manzanas y calles y solares. Eso no existía a los fines de esa escritura, y ésa es la parte jurídica." (T.E. pág. 46, Salas.) ▮

En segundo término la inscripción del contrato de venta no convalidó el "error cometido por el notario." Ya hemos decidido que, salvo un derecho hipotecario, la inscripción es sólo declarativa y no es fuente de derechos, ni modo de adquirirlos, sino de garantizar los ya existentes legalmente, que no arranca el vicio o error al acto, o contrato que la causó, ni suple al título ni da fuerza a lo que no la tiene, ni vida a lo que nació sin ella. (¹²)

---

(¹²)*Baldrich* v. *Registrador*, 77 D.P.R. 739, 745 (1954); *Jiménez* v. *Alvarez*, 69 D.P.R. 323, 332 (1948); *Pérez* v. *Montañez*, 45 D.P.R. 23, 28 (1933); Art. 33, Ley Hipotecaria.

La doctrina del citado caso de *Baldrich* no tiene aplicación al presente. En él resolvimos que a solicitud única de unos urbanizadores, no podía ordenarse al Registrador que procediera a cancelar las restricciones inscritas limitando el uso de ciertos solares, tan sólo para fines comerciales y recreativos, de una urbanización ya construida y desarrollada y en parte vendida en solares residenciales, porque tales reservas, restricciones o limitaciones del uso de esos solares específicos, que habían sido expresamente incluidas en la cláusula de condiciones restrictivas de las escrituras que motivaron las correspondientes inscripciones, en tanto eran beneficiosas para todos los demás solares residenciales, constituían derechos reales en favor de esos solares residenciales. No existe pacto alguno en la escritura de venta a la señora Goenaga sobre el uso futuro del todo o parte del remanente de la finca principal, ni allí se establecen reservas, restricciones o limitaciones sobre ese remanente. La descripción de la parcela en la escritura sólo tuvo por objeto su identificación, señalar el objeto del contrato. Muy fácil les hubiera sido a los otorgantes su consignación en el documento de venta de haberlas acordado, o en el acta aclaratoria que después suscribieron ante notario, o en cualquier documento privado otorgado por ellos.

La única reserva que parece se hizo del remanente de la parcela es la que la propia demandante reconoce en su carta del 18 de julio de 1949, que hemos transcrito, y en la parte que dice: "a tu esposa Pepita le interesó retener esos terrenos para ustedes y unos familiares."

## V

El decimocuarto señalamiento se refiere a la conclusión de hecho número 27, por la que se determina que la calle número 6 tenía encintados a la calle número 5. Carece de importancia este error, pues aun admitiendo que los tenía, no hubo prueba de cuál fue la persona que hizo tales encintados. No hubo prueba tampoco de que los hermanos O'Neill

construyeran calle alguna de las proyectadas en el plano. La calle O'Neill la había hecho el señor Huyke; la número 4, la construyeron varios vecinos. Los recurrentes en su alegato exponen que la calle número 6 la hizo Jorge Rosario y que el juez de instancia se negó por ciertos tecnicismos a recibir su testimonio al respecto y también "a recibir y examinar el plano del colindante Arturo Ocasio, aprobado por la Junta de Planificación y archivado en el Registro de la Propiedad. En ese plano aparece la calle número 6 sin entrada a la alegada calle núm. 5." Dicen también allí—sin que ello aparezca de evidencia alguna que tuviera el juez de instancia antes de dar su fallo—que "es cuestión de récord de la Junta de Planificación que esa calle Núm. 6 fue construida sin relación alguna a la alegada calle Núm. 5." En su Informe del 13 de junio de 1956 confirmando su Extensión al Informe 1–14,517 (Exhibit 12 de la demandante-apelada), la Junta declara:

" '10. Que la Calle Núm. 6 se construyó en el 1939 ignorando por completo la llamada Calle Núm. 5, pues sus encintados fueron construidos en línea recta y continúa indicando, a nuestro juicio, que dicha Calle Núm. 6 no fue construida con miras a establecer enlace o continuidad con la referida Calle Núm. 5.' "

## VI

En los restantes tres señalamientos respecto a las conclusiones de hecho, atacan los recurrentes las números 28, 29 y 30. Mediante ellas determinó el tribunal de instancia que: La Junta de Planificación aceptó las calles Núms. 4 y 5 al lotificar la propiedad de los demandados, describiendo al solar vendido a la demandante como colindando con dichas calles 4, 5 y O'Neill; que dicho organismo "con posterioridad a la lotificación del solar vendido a la demandante" reconoció y aceptó la urbanización Garden City al aprobar y lotificar subsiguientes segregaciones y que la Junta a solicitud de los demandados, sin notificar ni hacer parte a la demandante, aprobó la lotificación del remanente de la parcela de los her-

manos O'Neill en los dos solares que se describen en el párrafo octavo de la demanda enmendada "haciendo caso omiso e ignorando dicha Junta su informe L–692 de fecha 8 de marzo de 1946, en que lotificó el solar vendido a la demandante como colindando por el Norte y Oeste con las calles Núms. 5 y 4..."

Las últimas cuatro conclusiones sobre los hechos, números 31, 32, 33 y 34 no son atacadas por los recurrentes. La 31 se refiere a la venta de uno de los dos solares al Banco Popular; la 32 a una advertencia hecha por los demandados a la demandante de que la calle número 5 había sido eliminada y que nadie tenía sobre ella derecho alguno de servidumbre; la 33 que la demandante compareció ante la Junta y solicitó la enmienda o nulidad del informe L–14,517 de marzo 18 de 1953; y la 34 a que los demandados prohibieron a la demandante transitar a lo largo de la calle número 5 y le negaron todo derecho a dicha calle.

La conclusión 28 en que se expone que la Junta de Planificación aceptó las calles números 4 y 5 al lotificar la propiedad de los demandados, describiendo el solar vendido a la demandante como colindando con las calles 4, 5 y O'Neill, apenas se sostiene por la evidencia presentada; no obstante ser correcta en apariencia, puesto que es cierto que al aprobar en 1945, en el caso 346 lot., esa Junta la segregación del solar vendido en ese año a la señora Goenaga la Junta lo describió con esas colindancias y la finca principal por su lado Este. Y como varias veces hemos dicho, volvió a repetirse el error del notario. Su causa se debió según la propia Junta resolvió a haberse tomado la descripción del solar de la escritura de compra, según resulta del Exhibit 12 de la parte demandante, o sea, la Resolución del 13 de marzo de 1954, que en parte dice:

"5. Que la descripción de la propiedad de la peticionaria según la escritura de adquisición al referirse a su colindancia Norte dice lo siguiente 'con la Calle Número Cinco en proyecto.'

"6. Que la Junta al aprobar la lotificación en el caso 346 lot., se refiere a la colindancia Norte en la forma siguiente 'con la Calle Núm. 5.'

"7. Que la descripción de la propiedad adquirida por la peticionaria según el informe en el caso 346 lot. *fue copiada de la escritura* y que por omisión no se incluyó la frase 'en proyecto.'

"8. Que los dueños de la finca reagrupada en la escritura de venta nunca han asumido, en cuanto a los reglamentos y decisiones de la Junta, la obligación de construir la referida Calle Núm. 5.

.    .    .    .    .    .    .    .

"11. Que de acuerdo con la mejor técnica de urbanismo la construcción de dicha calle Núm. Cinco afecta seriamente al mejor desarrollo urbana [sic] del área.

.    .    .    .    .    .

"13. Que el solar de la peticionaria da a dos frentes [Calle O'Neill antes Núm. 1 y a la Calle Núm. 4.]

"14. Que la Junta al aprobar la formación del solar de la peticionaria (Caso 346 lot.) indicó 'que este solar cuenta con las facilidades mínimas.'

"15. Que la Junta en ningún momento ha indicado que la razón para aprobar la segregación del solar de la peticionaria lo fuera 'por estar aprobado anteriormente dicho plano por el Departamento de Sanidad de Puerto Rico, antes de entrar en vigor la Ley sobre Planificación y lotificación de 1942, la dicha Autoridad de Planificación da su conformidad para la segregación que antecede' como se hizo constar en la escritura de segregación.

"16. Que en la escritura de compraventa la peticionaria se comprometió a 'cumplir con el requerimiento de la Junta relativo a la *construcción de aceras frente al solar que ella por la presente adquiere'.* (Subrayado nuestro.)

"17. Que esta Junta no requirió aceras ni obra alguna relativa a la Calle Núm. 5.

"18. Que esta Junta, de haber considerado que dicha Calle 5 era parte del desarrollo del área hubiera exigido su construcción en el caso Núm. 346 lot.

"19. Que esta Junta nunca ha considerado conveniente o necesaria la construcción de dicha Calle Núm. 5.

"20. Que esta Junta requirió aceras frente al solar a segregarse (Caso 346 lot.) y no incluyó en su requerimiento aceras frente a la Calle Núm. 5.

. . . .. .. .. .. .. .. .. .. .. .. .. .. .. ..

"22. Que la Calle Núm. 5 ha estado bajo el dominio directo de los señores O'Neill y formando parte de un solo cuerpo de terreno con el resto de la propiedad.

"23. Que la Calle Núm. 5 *nunca ha estado abierta al público ni nunca ha sido usada como calle.*

"24. Que las urbanizaciones antes de la aprobación del Reglamento de Planificación # 3 (Lotificación) se regían por la Ley Núm. 11 de 1931.

"25. Que en la urbanización de estos terrenos no se dio cumplimiento a las disposiciones de la Ley Núm. 11 de 1931.

"26. Que los planos de lotificación preparados con anterioridad a la vigencia del Reglamento de Planificación Núm. 3 (Lotificación) *sólo servían de guía y en nada obligaban en cuanto a la formación de solares especialmente sobre área, forma y dimensiones.*

"27. Que para los terrenos objeto de este caso no se aprobó *como urbanizada* la parcela de terreno por las autoridades competentes.

"28. Que no habiendo sido aprobada como terminada la urbanización por las autoridades competentes deja sin valor el plano preparado.

. . . .. .. .. .. .. .. .. .. .. .. .. .. .. ..

"31. Que la reagrupación de las parcelas en un solo cuerpo verificadas en el mismo documento de compraventa de la parcela adquirida por la peticionaria no se refiere a la Calle Núm. 5 así como tampoco la descripción de los solares que fueron reagrupados."—Énfasis suplido.—T.E. págs. 154–157, Clavell.) ■

La recurrida expone en su alegato—pág. 36—que esa resolución de la Junta fue dejada "sin efecto por esta Suprema Corte mediante resolución de abril 8 de 1954." Hemos examinado esa resolución nuestra. La acción que allí tomamos fue la de desestimar, por prematura, la solicitud de revisión radicada respecto a la citada resolución del 13 de enero de

1954 de la Junta. Expresamos, sin embargo, que la Junta oiría a la peticionaria sobre las cuestiones envueltas en esa resolución, y que "suponemos que la Junta dejará dichas conclusiones sin efecto y luego de oir la prueba pertinente procederá a dictar la resolución que corresponda a base de nuevas conclusiones de hecho y de derecho." ■■

· No se nos ha demostrado por la recurrida que la Junta de Planificación procedió, final y efectivamente, a dejar sin efecto esas conclusiones. A casi todas ellas habríamos llegado sin la ayuda de esa resolución.(13)

Por la conclusión número 29 determinó el juez sentenciador, en síntesis, que la Junta "reconoció y aceptó la urbanización Garden City al aprobar y lotificar subsiguientes segregaciones" de solares que componían la Manzana "C" del plano de 1926.

Según resulta del Exhibit 4 de la parte demandante, por escrituras otorgadas el 27 de julio de 1946 y 30 de agosto de 1949—muy posteriores a la de la venta a favor de la señora Goenaga—los hermanos O'Neill segregaron de sus terrenos los cinco solares que en el plano de 1926 componían la Manzana "C" de la proyectada urbanización Garden City. Para hacerlo tuvieron que obtener y obtuvieron primeramente—tal como se hace constar en ese Exhibit 4, —la aprobación de la Junta de Planificación, como tuvieron que obtenerla para

(13) El 29 de mayo de 1961,—más de dos años de haberse sido sometido para su decisión este recurso—los recurrentes presentaron una moción solicitando que se consideraran tres resoluciones de la Junta de Planificación, dictadas en el caso 12,208 lot.—sobre división del remanente de la parcela de los hermanos O'Neill en dos parcelas—, una el 13 de junio de 1956, otra el 15 de mayo de 1957 y la última el 9 de diciembre de 1959. A esa moción se opuso la recurrida oportunamente por la razón principal de que esas tres resoluciones no fueron objeto de evidencia en el curso del juicio ante el tribunal de instancia, ni apreciadas o juzgadas por el juez sentenciador al dictar la sentencia recurrida y, además, porque no eran finales esas resoluciones "por estar pendiente recurso de apelación establecido contra elllas." A esas alturas del recurso era improcedente tomar en consideración tales resoluciones y hubiéramos cometido una grave injusticia para el juez sentenciador de haberlas tenido en cuenta en la resolución del caso. Debe, desde luego, entenderse denegado todo permiso para su presentación.

realizar la venta del solar de la señora Goenaga en el año 1945. Al describirse cada uno de los cinco solares, se decía que era el número tal, con cabida de tantos metros, situado en la Manzana "C" de la Urbanización Garden City de Hato Rey, Río Piedras, y se daban sus medidas. Todas estas circunstancias descriptivas coincidían con los datos de los cinco solares de la Manzana "C" de lo que hubiera sido aquella urbanización según el plano de 1926. Positivamente, este plano les sirvió de guía a los hermanos O'Neill para solicitar, y a la Junta de Planificación para aprobar y autorizar, esas segregaciones principalmente en cuanto a la identificación o descripción de esos solares. Si hubiera existido una urbanización desarrollada, hecha o construida oportunamente conforme al plano de 1926, aprobada por las autoridades que antecedieron a la Junta, e inscrita en el Registro de la Propiedad, respecto a la totalidad de la parcela de los hermanos O'Neill, no hubiera habido la necesidad de solicitar la aprobación de la Junta para esas segregaciones.([14]) ▮

La proyectada Calle Número 5 aparece trazada fuera de la Manzana "C" en el plano. No formaba parte de esa manzana. Hubiera separado nada más que las Manzanas "B" y "D". Tres de esos cinco solares de la Manzana "C" tienen sus entradas principales a la Calle O'Neill y dos a la Calle Número 4, que fue construida por varios vecinos, después de la venta a la demandante. Ni la aprobación por la Junta de la segregación del solar vendido a la demandante, ni la aprobación de las posteriores segregaciones, pueden considerarse título alguno de servidumbre de paso o de cualquier otra naturaleza. ▮

Es cierto que en el año 1953, como expuso el juez sentenciador en su conclusión de hecho número 30, los hermanos O'Neill solicitaron de la Junta de Planificación, sin notificar de ello a la señora Goenaga, la aprobación de la división en

---

([14]) Cf. *Alicea* v. *Registrador*, 71 D.P.R. 592, 598 (1950); *Wilcox* v. *Registrador*, 67 D.P.R. 475,480 (1947) y *Matos* v. *Junta de Planificación*, 66 D.P.R. 439,441 (1946)—Arts. 21 y 24 de la Ley 213, antes citada.

dos solares del remanente de 3,000.964 metros cuadrados de la parcela comprada por ellos en el año 1927 al señor Huyke y que dicha junta, sin oir a la colindante señora Goenaga, aprobó la lotificación propuesta por resolución del 18 de marzo de 1953, dividiéndose ese remanente en dos solares. Uno de ellos, el solar marcado "A", tiene una cabida de 1,820.289 metros cuadrados, está situado al fondo de la parcela original, y en su descripción aparece que linda "por el Sur, en 31.90 metros con el solar 'B' de la finca principal abajo descrito y en aproximadamente 32.00 metros con la Sra. Conchita Goenaga; ... ." Su salida principal es hacia la Avenida Muñoz Rivera, teniendo otra salida por el oeste, en una extensión de 11.595 metros, a la calle número 4. El otro, marcado como solar "B", tiene 1118.675 metros cuadrados, hace esquina a la Avenida Muñoz Rivera y a la calle O'Neill y por su lado oeste linda con la demandante. Este solar "B" fue vendido al Banco Popular. Pero ni la Ley Núm. 213 ni el Reglamento Núm. 3, exigen que se notifique inicialmente una petición de lotificación a los colindantes. Basta, según el Art. 4 de ese Reglamento que la declaración de intención de lotificar sea hecha por la persona interesada en realizar la lotificación "en el impreso dispuesto por la Junta" y que "la presente ante el Secretario de la Junta."

El Art. 17 del Reglamento Núm. 1 sólo exige que la Junta notifique sus acuerdos a aquel que aparezca como "parte directamente interesada de acuerdo con la documentación obrante en el expediente del caso." La señora Goenaga vino a personarse en el expediente el 12 de junio de 1953, tres meses después de aprobarse la lotificación, y a los fines de que se enmendara la descripción del solar "A" retenido por los hermanos O'Neill, respecto a su colindancia sur y para que apareciera lindando con la calle número 5 y no con el solar de ella; sostuvo que la faja de la calle número 5, según el plano de 1926, era una calle pública, sobre la cual ella tenía un derecho de servidumbre y que el terreno que encerraba la misma no formaba parte del solar "A".

La Junta de Planificación oyó ampliamente a la señora Goenaga. Luego dictó la resolución del 13 de enero de 1954 a que antes nos hemos referido. Como ya hemos visto, ninguna base legal tenía ella para obtener la enmienda o alteración de la colindancia sur del nuevo solar "A" de los hermanos O'Neill del modo que ella pedía.

Hasta aquí llega nuestro análisis y examen de las conclusiones impugnadas. En vano hemos realizado un esfuerzo para encontrar fundamentos de hecho y de derecho suficientes y apropiados para sostener las conclusiones y el fallo del tribunal de instancia.

Según lo expuso la parte demandante el hecho mayormente en controversia fue la existencia de la calle número 5 a la fecha en que compró el solar la demandante, "y si no existía, si había la servidumbre." El cumplimiento del contrato se pedía "en cuanto se abra la calle o se respete la servidumbre." —T. E. 3–4, Clavell.—El fallo fue desacertado porque como cuestión de hecho y de derecho la señora Goenaga nunca tuvo el título necesario para establecer a su favor el alegado derecho de servidumbre.

La fuente principal de las relaciones jurídicas entre las partes es el contrato de compraventa celebrado el 27 de junio de 1945. En virtud de ese contrato los hermanos O'Neill se limitan a vender a la señora Goenaga un solar de 1465.22 metros cuadrados que por el mismo documento segregaron de la parcela de terreno de 5,927 metros cuadrados comprada por ellos al señor Huyke.

". . . otorgándole el presente título como transferencia del dominio, la posesión y cuantos derechos tienen ellos y sus poderdantes *sobre la parcela de terreno ya dicha y objeto de esta comproventa.* . . ."—Énfasis suplido.

Esos fueron todos los derechos que ellos trasmitieron a la demandante. En forma alguna se obligaron principal o accesoriamente a constituir, crear, conceder, reconocer o respetar algún derecho real de servidumbre de paso o de cualquier

otra clase sobre todo o parte del remanente de la parcela principal como predio sirviente y en favor del solar vendido a la demandante como predio dominante. Las únicas restricciones o condiciones impuestas en el documento son las que se imponen a o se asumen por la señora Goenaga en cuanto a no construir edificaciones de maderas, ni "fábricas que hagan ruidos indeseables ni lancen al aire partículas que vicien el mismo," obligándose "a cumplir el requerimiento de la Junta de Planificación relativo a la construcción de aceras *frente al solar que por la presente adquiere.*" Según resulta del documento aclaratorio otorgado por ellos días después, la Junta de Planificación también impuso como condición para aprobar la segregación la prohibición absoluta de levantar o construir edificación en el solar segregado a una distancia menor de cuatro metros del encintado, al norte de la calle O'Neill.

Hemos resuelto que una vez trazado un plano de urbanización sobre un terreno dividido en manzanas, calles y solares, el urbanizador está impedido de negar el uso de las calles trazadas y construidas a los compradores de solares, y que éstos adquieren el derecho de usar las calles trazadas y construidas no sólo contra el urbanizador, sino también contra cualquier otra persona que limite y perturbe el uso y disfrute de tales calles.([15]) Sin embargo, esa jurisprudencia parte del supuesto de una urbanización existente, real y verdadera. Ya sabemos que al celebrarse la compraventa no existía un solo metro urbanizado y que el plano de 1926 había perdido su valor y eficacia como plano para urbanizar.

Los hermanos O'Neill cumplieron con su obligación de entregar materialmente el solar a la compradora señora Goenaga. Ésta edifica su taller de costura sobre el mismo en el año 1946, con amplios frentes y salidas a las calles O'Neill y número cuatro. Para entrar a y salir de su propiedad no necesita pasar sobre terrenos de los hermanos O'Neill. Hasta

---

([15]) *Ferrer* v. *Varela*, 71 D.P.R. 76, 81 (1950), *Capella* v. *Carrera*, 48 D.P.R. 830, 840 (1935).

el mes de marzo de 1953 no había reclamado derecho alguno de paso sobre esos terrenos.

La mera existencia de la veredita, trillo o caminito irregular, que había dejado sobre esos terrenos el tránsito de los residentes del arrabal, no podía constituir "un signo aparente de servidumbre" entre el solar comprado por la demandante y el remanente de la parcela principal, *"establecido por el propietario"*, como dispone el Art. 477 de nuestro Código Civil. ([16])

Ni la escritura de venta ni la conducta o actos anteriores o posteriores al contrato o durante su otorgamiento, de los hermanos O'Neill, indican de modo alguno deseo, disposición o intención de parte de ellos de dedicar o consagrar faja alguna de su parcela para el uso público.

A la conveniencia o comodidad para la demandante de dotar a su propiedad, gratuitamente de una área de construcción mayor, como resultado de formar nueva esquina con la llamada calle número 5, aumentando su valor en el mercado en un veinte (20%) por ciento—el corredor de bienes raíces Guillermo Bermúdez tasó el metro cuadrado del solar de la demandante, en el año 1945, entre $40.00 y $45.00; T. 131, Clavell—nueve años antes ella lo compró a $3.00 el metro cuadrado; T. 57, Clavell—no se le puede atribuir la categoría de un derecho real de servidumbre predial sobre la finca del vecino.

No es justo obligar, sin un claro derecho para ello, a un propietario colindante a gravar permanente y gratuitamente su predio en un 33% de su cabida, con una "servidumbre de paso, luz, aire y vista" que reduce sustancialmente su área de construcción—si es que se le permite edificar en la parte no

---

([16]) Resolvimos en *Compañía Azucarera del Toa* v. *Galán, et al.*, 28 D.P.R. 844, 850 (1920), que la mera existencia de algunas veredas y ramificaciones y su uso más o menos intermitentemente, no constituye el aviso suficiente de una servidumbre de paso, y en *González* v. *Fernández*, 49 D.P.R. 29, 31 (1935), que el signo a que se refiere ese artículo debe ser permanente, no variable, ni accidental.

afectada—y que le priva del uso ilimitado de su única salida por su lado oeste—la servidumbre decretada tiene 13 metros de ancho y la salida por ese lado oeste a la calle número 4 es sólo de 11.595 metros.  Véase Anexo.

*Se revocará la sentencia recurrida y se dictará otra desestimando en todas sus partes la demanda-enmendada.*

-Norte-

Demostración gráfica de los tres solares existentes después de la última lotificación, y de la proyectada Calle Núm. 5.