EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>Manuel Pizarro Colón | QUERELLA<br><br>2000 TSPR 106 |

Número del Caso: CP-1996-09 Y CP-1997-08 CONSOLIDADOS

Fecha: 25/mayo/2000

Colegio de Abogados:

      Lcda. María De Lourdes Rodríguez

Abogado de la Parte Querellada:

      Lcdo. Pedro Malavé Vega

Materia:  Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Manuel Pizarro Colón          CP-96-9
                                   CP-97-8

PER CURIAM

San Juan, Puerto Rico, a 25 de mayo de 2000

Para fines decisorios, hemos consolidado estas dos (2) querellas, aunque en su estructura interna, las exponemos separadamente, siguiendo el orden de presentación.

I

El 16 de julio de 1996, el Colegio de Abogados de Puerto Rico presentó querella contra el Lcdo. Manuel Pizarro Colón –admitido al ejercicio de la abogacía y notaría el 28 de junio y 16 de julio, respectivamente–,[1] imputándole                                                    violación

---

[1] Subsiguientemente, el 9 de enero de 1997, por Sentencia, lo suspendimos **temporeramente** de ambas funciones por deficiencia en su obra notarial e incumplimiento a nuestras órdenes.

a los Cánones 2, 8 y 19 de Etica Profesional. Previa resolución nuestra de 18 de octubre de 1996, el 13 de agosto de 1997, el Colegio presentó segunda querella CP-97-8, imputándole infracciones a los Cánones 12, 21, 35 y 37. En ambas querellas, designamos Comisionado Especial al Hon. Flavio E. Cumpiano Villamor, Ex Juez Superior, para que en presencia de las partes, oyera y recibiera la prueba.

Luego de varios incidentes interlocutorios y trámites -incluso querella enmendada-, el 7 de julio de 1998, se celebró la vista evidenciaria[2] y el 9 de julio de 1999 el Comisionado rindió su informe en torno a la querella CP-96-9. El 31 de agosto, hizo lo propio respecto a la querella CP-97-8. En ambos, consignó los hechos que sirven de trasfondo a nuestra decisión. Expongámoslos.

II

Querella CP-1996-9

En 1979, la Sra. Mariana Caraballo Pérez adquirió un inmueble, sito en la Urb. Santa María, Calle B-115, Ponce. Asumió hipoteca de $35,000.00, reducida a $32,660.45 y constituyó segunda hipoteca en garantía de un pagaré al

---

Conforme la norma pautada en In re: Vergne Torres, 137 D.P.R. 777 (1995), en vista de las etapas adelantadas de ambas quejas, continuamos el trámite disciplinario de las querellas.

[2] A pedido del Colegio, el 26 de septiembre de 1997, suspendimos los procedimientos por seis (6) meses, debido a una oferta de transacción, reservándonos la decisión final sobre los efectos de cualquier transacción en los trámites disciplinarios. El 12 de mayo de 1998, por recomendación del Comisionado Especial, extendimos la paralización seis (6) meses más.

portador por $19,340.00 que entregó a los vendedores en pago y garantía del precio aplazado de compraventa. Años después, el 26 de febrero de 1986, el Tribunal Superior, Sala de Ponce, dictó sentencia en cobro del principal de $19,340.00 garantizado por la **segunda hipoteca**, más intereses, costas, gastos y honorarios de abogados. **Dicha Sentencia se anotó en el Registro de Sentencias del Registro de la Propiedad de Ponce I, el 30 de septiembre de 1987.**

El 13 de marzo, la Federal Home Loan Mortgage Corp. demandó ante el Tribunal Federal para el Distrito de Puerto Rico, en ejecución de la **primera hipoteca**, ante el incumplimiento de los pagos mensuales. El 26, solicitó al Registrador de la Propiedad de Ponce, anotara la demanda. **Dicha anotación se insertó en la nota marginal a la inscripción del inmueble cuyo titular era la Sra. Caraballo Pérez.**[3]

El 21 de mayo, radicada (y presentada al Registro), la demanda de ejecución de la primera hipoteca y emplazada su dueña, Sra. Caraballo Pérez, ésta concedió autorización exclusiva a Housing Real Estate[4] para la venta de la

---

[3] El Registrador no firmó la nota. Tuvo que ser firmada después por otro el 19 de agosto de 1988.

[4] Firma de corretaje de bienes raíces, de la cual el Lcdo. Pizarro Colón —quien posee además licencia de corredor de bienes raíces—, era socio por igual, junto a su sobrino, el Sr. José Hiram Santiago Ortiz. Compartían oficina en la Calle Torres en Ponce, desde donde también operaba Housing Real Estate. En septiembre de 1986, inscrita en el Departamento de Estado el 27 de octubre,

propiedad. Dicho acuerdo lo suscribió el Sr. José Hiram Santiago Ortiz –sobrino y socio del Lcdo. Pizarro Colón en el negocio de bienes raíces–, a nombre y como agente autorizado de Housing Real Estate. Se anejó documento consignando: "2da –hipoteca $19,000.00– la primera hipoteca está atrasada y la segunda también – de la venta se pagará – todo". Acordaron además, que Housing Real Estate cobraría un cinco por ciento (5%) de comisión del precio de venta –$65,000.00–. Aunque no consta que el Lcdo. Pizarro Colón participara o interviniera directamente en el acuerdo, sí fue enterado del mismo. (Carta de 20 de abril de 1990, dirigida por él, al Colegio de Abogados).

Así las cosas, la Sra. Gloria Álvarez Sanabria acudió a Housing Real Estate interesada en comprar el bien. La atendió el Sr. Santiago Ortiz, con quien negoció y visitó el inmueble. Las veces que visitó la oficina de Housing Real Estate, vio al Lcdo. Pizarro Colón ser consultado por el Sr. Santiago Ortiz y otras personas de la empresa.

El 2 de julio, la Sra. Álvarez Sanabria –como compradora–, otorgó contrato de compraventa con la Sra. Caraballo Pérez –dueña y vendedora–, representada en el acto de otorgamiento por el Sr. Santiago Ortiz. Se fijó en $65,000.00 el precio de venta, $26,000.00 las deudas del

---

incorporaron a "Housing de Ponce y Caguas, Inc.", que operaba coetánea y separadamente con "Housing Real Estate". Entre sus objetivos y propósitos, según certificado de incorporación, "Housing de Ponce y Caguas, Inc.," no se dedica al corretaje de bienes raíces, específicamente, al negocio de comprar y vender Bienes Raíces.

inmueble **(sin hacer referencia a al deuda de $19,340.00 garantizada por la segunda hipoteca y sobre la que recayó sentencia)** y $39,000.00 la cantidad a pagarse en efectivo. La Sra. Álvarez Sanabria entregó $10,000.00 y pagaría los otros $29,000.00 en treinta (30) días.[5]

El 12 de septiembre de 1987, la Sra. Álvarez Sanabria y el Sr. Santiago Ortiz –en representación de Housing Real Estate–, **otorgaron documento suplementario**, en el que acusaron recibo de un cheque de ella por $20,000.00, como adelanto de los $29,000.00 que le restaban pagar, haciendo constar que el dinero saldaría una de las deudas hipotecarias que gravaban el inmueble. **No se mencionó la sentencia de ejecución sobre la segunda hipoteca.** Además, Housing Real Estate se comprometió pagar las mensualidades adeudadas –hasta el momento de firmarse la escritura por la Sra. Caraballo Pérez–, al Home Federal Savings –entonces Caguas Federal Savings Bank–, de los $10,000.00 adelantados por la Sra. Álvarez Sanabria. No fue hasta el 16 de noviembre de 1987 –dos (2) meses después de la **enmienda supletoria** y luego de otorgada la Escritura de Compraventa en que se asumió la segunda hipoteca–, que el Sr. Santiago Ortiz entregó cheque certificado a favor de Carmen Ramos y Héctor Cupril por $7,100.00 para satisfacer la sentencia en ejecución de la segunda hipoteca.

---

[5] Se hizo constar que la vendedora Sra. Caraballo Pérez, pagaría $4,301.23, cantidad adeudada en contribuciones sobre la propiedad. Acordaron que otorgaría pagaré por la cantidad adeudada, garantizado con propiedad que habría de adquirir.

El 5 de noviembre de 1987, las Sras. Caraballo Pérez y Álvarez Sanabria suscribieron escritura núm. 86 sobre Compraventa y Subrogación, **preparada y autorizada por el Lcdo. Pizarro Colón.** Se hizo constar, la existencia de la primera hipoteca "reducida a $26,000.00" y de la segunda por $19,340.00 e indicó que, la Sra. Álvarez Sanabria retenía su monto para el pago de las mismas. Se afirmó que la Sra. Álvarez Sanabria ya había pagado $39,000.00. **El Lcdo. Pizarro Colón no realizó estudio registral del inmueble antes de otorgar la escritura por lo que desconocía su estado en el Registro. Por ende, no informó a la compradora Sra. Álvarez Sanabria que el 30 de septiembre de 1987 –posterior a ella entregar a Housing Real Estate $20,000.00 para saldar la segunda hipoteca–, se había anotado sentencia ejecutando la hipoteca. Tampoco informó la anotación preventiva de demanda en ejecución de la primera hipoteca que se asumiría en la escritura de Compraventa.** Para esta fecha, ya el Tribunal Federal para el Distrito de Puerto Rico, había dictado Sentencia el 21 de octubre de 1987.

El 12 de noviembre, días después de otorgada la Escritura, la Sra. Álvarez Sanabria entregó cheque por $896.34 a favor de Housing Real Estate para el pago de las mensualidades de la primera hipoteca por los meses de octubre y noviembre de 1987. Housing lo cambió. El 26 de febrero de 1988, entregó otro cheque por $896.34, esta vez a favor del Lcdo. Pizarro Colón, para pagar las

mensualidades de la primera hipoteca correspondientes a los meses de diciembre de 1987, y enero y febrero de 1988. El Lcdo. Pizarro Colón lo endosó en blanco y luego lo endosó el Sr. Santiago Ortiz, quien lo cobró el mismo día. **Housing Real Estate, el Sr. Santiago Ortiz, ni el Lcdo. Pizarro Colón pagaron las mensualidades para cuyos pagos la Sra. Álvarez Sanabria les entregó el dinero. Tampoco pagaron las adeudadas sobre la primera hipoteca hasta el 5 de noviembre de 1987, tal y como se obligó Housing Real Estate hacer en el anejo supletorio de 12 de septiembre de 1987. Ninguno informó a la Sra. Álvarez Sanabria sobre las mensualidades impagadas.** De hecho, al presentarse meses después –15 de marzo de 1988–, la Escritura Núm. 86 de Compraventa y Subrogación de Obligación al Registro para su inscripción, ya se había celebrado segunda subasta y adjudicado la buena pro en la ejecución del inmueble.

Posteriormente, a la Sra. Álvarez Sanabria –mientras trabajaba en la casa para habilitarla–, fue notificada de que había sido subastada y sería desalojada. Inmediatamente, acudió donde el Lcdo. Pizarro Colón para reclamarle. Sorprendido, el Lcdo. Pizarro Colón le informó que le pagaría todos los gastos y desembolsos para que ella no perdiera su inversión. Acordó darle garantía hipotecaria. **El 19 de marzo, "Housing de Ponce y Caguas, Inc.",[6] representada por el Sr. Santiago Ortiz, mediante**

_____

[6] Corporación que operaba coetánea y separadamente de la sociedad "Housing Real Estate", que no se dedicaba al corretaje de bienes raíces.

**afidávit núm. 3558 autorizado por el Lcdo. Pizarro Colón, otorgó pagaré por $39,000.00 a un seis por ciento (6%) anual, vencedero a su presentación. Ese mismo día, otorgó Escritura Núm. 13 de hipoteca en garantía del pagaré por $39,000.00 sobre un inmueble de la Corporación Housing de Ponce y Caguas, Inc., ante el Lcdo. Pizarro Colón.** Es decir, el garantizador era una tercera entidad y no, Housing Real Estate, el Sr. Santiago Ortiz, ni el Lcdo. Pizarro Colón. Dicha Escritura garantizando el pagaré, no especificó el monto de la hipoteca primera y preferente que afectaba el bien dado en garantía. **Resultó, que el pagaré en segundo rango no estaba garantizado, pues para su ejecución había que pagar la primera hipoteca, cosa imposible para la Sra. Álvarez Sanabria. Dicho pagaré hipotecario y la Escritura que pretendía garantizarlo, no fueron inscritos por no existir documentos corporativos complementarios que acreditaran el negocio y las facultades del otorgante –el Sr. Santiago Ortiz–, para efectuarlo.**

Así las cosas, el 25 de marzo de 1988, la Sra. Álvarez Sanabria solicitó intervención en el caso seguido en el Tribunal Federal para que se dejase sin efecto la ejecución en pública subasta del inmueble que había comprado. La Federal Home Loan Mortgage Corp. **se opuso basado en la existencia del "lis penden" desde el 26 de marzo de 1987 en el Registro de la Propiedad,** advirtiendo el litigio de ejecución de la hipoteca. Además, señaló que no se había

hecho pago alguno para satisfacer los atrasos de la hipoteca que se ejecutaba. El 5 de mayo, el foro Federal rechazó la intervención. El 12 de julio, previa orden del mencionado Foro del 5 de mayo, la Sra. Álvarez Sanabria fue desalojada del inmueble.

El 16 de agosto, la Sra. Álvarez Sanabria demandó al Lcdo. Pizarro Colón, Santiago Ortiz h/n/c Housing Real Estate y otros, en el Tribunal Superior de Ponce. Reclamó devolución de las sumas entregádales y daños y perjuicios. Mediante sentencias parcial y complementarias de 23 de febrero[7] y 6 de julio  de 1989, respectivamente, el Tribunal condenó al Lcdo. Pizarro Colón y al Sr. Santiago Ortiz, pagar solidariamente a la Sra. Álvarez Sanabria $64,867.19 por conceptos de las sumas entregádales, desembolsos por reparaciones y alteraciones a la casa que perdió y otros gastos relacionados. Además, $15,000.00 en daños y perjuicios y $2,500.00 por honorarios de abogado.

El 20 de diciembre, a raíz de las gestiones realizadas por la Sra. Álvarez Sanabria para asegurar y hacer efectiva la Sentencia  a su favor, el Lcdo. Pizarro Colón informó al Tribunal Superior sobre su petición de quiebra y la Orden de Paralización de los Procedimientos, emitida el 4 de abril de 1989.

III

---

[7] El 13 de abril de 1989, el Lcdo. Pizarro Colón y su esposa Margarita Rodríguez presentaron Petición de Quiebra bajo el Capítulo 13, ante la Corte de Quiebra de los Estados Unidos, Distrito de Puerto Rico. El 24 de agosto,

Los Cánones 2 y 18 de Ética Profesional imponen a los miembros de la profesión legal el deber de defender los intereses de sus clientes diligentemente, desplegando su máximo conocimiento en la forma generalmente aceptada por los miembros de la clase togada, como adecuada y responsable. In re: Mundo Rodríguez, res. en 10 de septiembre de 1998, 98 TSPR 120; In re: Cardona Ubiñas, res. en 29 de julio de 1998, 98 TSPR 114; In re: Osorio Díaz, res en. 30 de junio de 1998, 98 TSPR 103; In re: Vélez Valentín, 124 D.P.R. 403 (1989), In re: Arana Arana, 112 D.P.R. 838 (1982). Las difíciles y complejas gestiones en su quehacer jurídico –incluyendo su dimensión notarial–, tienen que enmarcarse dentro de los valores que se espera caractericen esta profesión. In re: Filardi Guzmán, res. en 23 de enero de 1998, 98 TSPR 4; In re: Pereira Esteves, res. en 30 de noviembre de 1998, 98 TSPR 160. Requiere cuidado y ser ejercida con sumo esmero y celo profesional, cumpliendo estrictamente con la Ley Notarial y los Cánones de Ética Profesional. In re: Vera Vélez, res. en 5 de abril de 1999, 99 TSPR 46; In re: Torres Olmeda, res. en 23 de abril de 1998, 98 TSPR 48; In re: Rodríguez Mena, 126 D.P.R. 205 (1990); In re: Vergne Torres, 113 D.P.R. 777 (1995). Es deber del abogado, entre otros, desempeñarse con la mayor y más excelsa competencia, responsabilidad e integridad; defender los intereses del cliente diligentemente y; mantener al cliente siempre informado de

---

se convirtió en petición bajo el Capítulo 17 del Código

todo asunto importante en el caso que se le ha encomendado. In re: Arroyo Rivera, res. en 19 de mayo de 1999, 99 TSPR 78; In re: Pereira Esteves, supra. In re: Mundo Rodríguez, supra. La indiferencia, desidia, despreocupación, inacción y displicencia en la tramitación de un caso, viola el Canon 18, In re: Arana Arana, supra, y produce la imposición de sanciones disciplinarias, In re: Torres Olmeda, supra; In re: Rivera Arvelo, 132 D.P.R. 840 (1993).

Intrínseco a estos deberes y buena observancia de las responsabilidades atinentes a la profesión, el abogado -también en su función notarial-, está obligado a realizar "las averiguaciones mínimas que requieren las normas más elementales de la profesión [y las leyes aplicables], y que en aquellas ocasiones en que tenga dudas sobre lo expresado por el otorgante, indague más allá de lo requerido comúnmente. A esos efectos, "[...] el notario que autoriza una escritura no puede ignorar el estado registral de la propiedad sobre la cual las partes otorgan la escritura a la fecha del otorgamiento". In re: Vera Vélez, supra. Es indeclinable su obligación de conocer el estado registral de la propiedad en su función principal de custodio de la fe pública, base esencial del sistema del notariado. Como tal, tiene el deber ineludible "de ilustrar a los otorgantes para lograr que éstos concurran al acto notarial en un estado de conciencia informada. Es decir, tiene que cerciorarse de hacerle a las partes todas aquellas

Federal de Quiebras.

explicaciones, aclaraciones y advertencias necesarias para lograr el consentimiento informado de los otorgantes". In re: Jiménez Brackel, res. en 11 de mayo de 1999, 99 TSPR 73. In re: Moreira Avillán, res. en 13 de noviembre de 1998, 98 TSPR 152. In re: Vargas Hernández, 135 D.P.R. 603 (1994); In re: López Maldonado, 130 D.P.R. 863 (1992); In re: Ramos Meléndez, 120 D.P.R. 796 (1988); In re: Meléndez Pérez, 104 D.P.R. 770 (1976); Goenaga v. O'Neill de Milán, 85 D.P.R. 170 (1962). Es incuestionable la importancia que reviste investigar los antecedentes, cargas y gravámenes, al hacerse o autorizarse una escritura, no sólo para efectos civiles o registrales, sino también para efectos notariales, "porque la determinación de las cargas es necesaria para la posterior concreción en la parte dispositiva de las responsabilidades que contrae cada parte contratante". Chévere v. Cátala, 115 D.P.R. 432, 443-444 (1984). Incurrir en esta falta, convierte al notario en "coautor de un consentimiento enfermo e ineficaz en derecho y habrá traicionado la fe de la que es principal guardador". In re: Meléndez Pérez, supra.

IV

El Lcdo. Pizarro Colón, preparó y autorizó Escritura de Compraventa y Subrogación sin realizar el debido estudio de título para conocer el estado registral del inmueble objeto de la Escritura. Ello ocasionó, que la Sra. Álvarez Sanabria adquiriera el bien desconociendo que contra ella había anotación preventiva de demanda en ejecución de la

primera hipoteca y que se había dictado y anotado sentencia ejecutando la segunda hipoteca que gravaba el inmueble. En efecto, cuando la Sra. Álvarez Sanabria solicitó intervención en el pleito seguido en el Tribunal Federal para el Distrito de Puerto Rico, buscando se dejase sin efecto la ejecución en subasta pública del inmueble, el foro federal rechazó su intervención al acoger el planteamiento del demandante de que desde el 26 de marzo de 1987, existía en el Registro anotación preventiva de demanda. No hay duda de que la falta de diligencia del Lcdo. Pizarro Colón fue el factor determinante que propició se perjudicara la causa de acción de su cliente –ante el foro federal– y finalmente perdiera su inversión en el bien. No honró la confianza depositada por su cliente, como conocedor de los procesos legales. Manifestó claro menosprecio a la suerte que correría el derecho de su cliente e infringió los Cánones 2 y 18 de Ética Profesional.

Además, se apartó del Canon 19, dispositivo de que "[e]l abogado debe mantener a su cliente siempre informado de todo asunto importante que surja en el desarrollo del caso que le ha sido encomendado". El Lcdo. Pizarro Colón omitió informar a su cliente adecuadamente las incidencias judiciales principales que afectaban el bien inmueble, ocasionando que la Sra. Álvarez Sanabria consintiera el negocio jurídico sin conocimiento de causa. A la postre, su conducta provocó que la Sra. Álvarez Sanabria perdiera su

inversión. <u>In re: Madro Classen</u>, res. en 7 de marzo de 1997, 142 D.P.R. ___.

V

### Querella CP-97-8[8]

"Housing Real Estate" también tenía oficinas en la Urb. Boneville de Caguas y eran atendidas por el Sr. Edwin Labrador. El 20 de agosto de 1986, antes de incorporarse Housing de Ponce y Caguas, Inc., Housing Real Estate y el Sr. Labrador, como agentes autorizados y representando a la vendedora Wanda Cruz Alicea, suscribieron Contrato de Compraventa mediante el cual acordaron, vender al Sr. Rafael Bezares Álamo una casa sita en el P-16 de la Urbanización Reparto Valencia de Juncos. El precio convenido fue $45,700.00 con pronto de $7,000.00, asumiendo primera hipoteca por $38,700.00.[9]

---

[8] El 25 de agosto de 1998, el Colegio y el Lcdo. Pizarro Colón suscribieron "Estipulación de Hechos", estableciendo, "que las gestiones para la venta concernida fueron realizadas por el Sr. Edwin Labrador en el área de Caguas, quien luego fue empleado y representante de la empresa corredora Housing de Ponce y Caguas, Inc.,..." El 2 de noviembre, luego de reexaminar y evaluar la prueba, el Colegio nos solicitó desistir de los cargos 1, 2 y 4, y se reiteró en el cargo 3.

[9] La Escritura de Constitución de la Hipoteca Núm. 103 de 15 de diciembre de 1983, que gravaba la propiedad, contiene cláusula prohibiendo enajenar, vender o gravar la propiedad sin la previa autorización escrita del Secretario de la Vivienda. Aunque, el Comisionado Especial no tuvo acceso al Registro de la Propiedad para determinar si tal restricción al derecho de propiedad se desprendía del asiento de inscripción de la hipoteca, en certificación emitida por el Registrador de la Propiedad el 4 de diciembre de 1987, se hace referencia a cargos por su procedencia, a la hipoteca constituida por la Escritura Núm. 103 de 15 de diciembre de 1983, y a los términos económicos y de vencimiento de la misma. **No obstante, la**

El 21 de octubre, se firmó en Philadelphia un documento titulado "Poder Especial", en el que la Sra. Wanda Cruz Alicea instituyó a la Sra. Raquel Cruz Alicea como su apoderada, con amplias facultades, para que en su nombre y representación vendiera el inmueble P-16 de la Urbanización Reparto Valenciano, cuya descripción registral se incluyó.  Al pie de la frase "y para que así conste", y de la indicación de la ciudad y fecha, aparece en letras mayúsculas y a maquinilla el nombre de Wanda Cruz Alicea. **Sobre ello aparece a manuscrito y a manera de firma, el nombre de Wanda Cruz Alicea.  Debajo de la firma, y en el formato de reconocimiento de firma que se utilizaba por los notarios, se indicó lo siguiente:**

> "Sworn and suscribes (sic) before me **by héctor (sic) Alfredo Figueroa Santiago of the personal circunstance (sic)** above stated, personally Know (sic) me at 21st day of October 1986."

Inmediatamente debajo de ese párrafo aparece la firma de Pedro C. Rodríguez como "Notary Public", cuya "Commission" expiró el 5 de mayo de 1989. Se acompañó certificación de William J. Devlin, "Deputy Prothonotary" del "Court of Common Pleas of Philadelphia County", a los efectos de que Pedro C. Rodríguez era para entonces un notario público autorizado en Pennsylvania.

---

**Certificación Registral no hace referencia alguna a la prohibición de enajenación sin la previa autorización del Secretario de la Vivienda.**

El 11 de noviembre, se otorgó ante el Lcdo. Pizarro Colón la Escritura Número 39, sobre Protocolización del Poder Especial antes mencionado. Compareció, como única parte, el Sr. Santiago Ortiz, **socio** del Lcdo. Pizarro Colón en Housing Real Estate, entidad que servía de corredora en la venta del inmueble para cuyo traspaso se pretendía protocolizar el "Poder Especial" que la Sra. Wanda Cruz Alicea supuestamente había conferido a la Sra. Raquel Cruz Alicea.  El Lcdo. Pizarro Colón unió el "Poder Especial" a la escritura y, por ende, a su protocolo de instrumentos públicos para 1986; la Escritura se inscribió el 26 de noviembre.

Dos semanas después, el 25 de noviembre, el Lcdo. Pizarro Colón autorizó la Escritura Núm. 41, sobre Compraventa y Subrogación de Obligación, mediante la cual el Sr. Bezares Alamo adquirió de la Sra. Wanda Cruz Alicea, representada por su "apoderada" la Sra. Raquel Cruz Alicea, el inmueble P-16 ubicado en el Reparto Valenciano de Juncos. Pagó $7,000.00 de pronto y asumió la hipoteca, reducida a $38,650.00. El Lcdo. Pizarro Colón no identificó la escritura en que se protocolizó el poder, pero sí indicó que el "apoderamiento se une junto a esta escritura". Sin embargo, no lo unió.[10]

---

[10] Antes de otorgarse dicha Escritura de Compraventa, existían atrasos en las mensualidades de la hipoteca.  En septiembre de 1986, el comprador Bezares Alamo, pagó $1,129.30 para poner al día la cuenta. Después de adquirir la propiedad, continuó pagando los plazos mensuales hasta julio de 1987. No pudo pagar los cuatro (4) plazos de agosto a noviembre de 1987.

El 18 de noviembre de 1987, el Sr. Bezares Alamo presentó petición de quiebra bajo el Capítulo 13 de la Ley de Quiebras. En ese procedimiento no incluyó en el listado de propiedades inmuebles la propiedad adquirida en el P-16 del Reparto Valenciano ni la deuda hipotecaria asumida.

Así las cosas, y debido a que no se pagaron las mensualidades hipotecarias desde el primero de agosto de 1987, -ocho (8) meses después de haberse otorgado la Escritura de Compraventa, el 25 de noviembre de 1986-, la tenedora del pagaré, Caguas Central Savings, el 30 de noviembre de 1987, un año después de la compraventa, instó demanda de ejecución de hipoteca contra la titular registral del inmueble, la Sra. Wanda Cruz Alicea. El Sr. Bezares Alamo, aunque había radicado ya la petición de quiebra, remitió giros bancarios a la acreedora hipotecaria por el monto correspondiente a cada una de las mensualidades adeudadas, el 9, el 15 y el 17 de diciembre de 1997, dos el 27 de enero, dos el 4 de abril y uno el 9 de mayo de 1988. La acreedora hipotecaria no hizo efectivo ni cobró esos giros porque ya se encontraba radicada la demanda de ejecución; no cubrían la totalidad del balance de la hipoteca; y porque no incluían la suma requerida -$500.00-, para la reinstalación del préstamo y desistimiento del caso, suma que el Sr. Bezares Alamo rechazó pagar. La acreedora hipotecaria continuó con los trámites del caso. El 7 de abril de 1988, el Tribunal Superior, Sala de Caguas, dictó sentencia en el caso de

ejecución de hipoteca. El 4 de octubre, se subastó la propiedad y el 21, el Sr. Bezares Alamo –quien no era parte del caso–, presentó solicitud de paralización de los procedimientos acompañando el "Stay Order" de su petición de quiebra de 18 de noviembre de 1987. Desde entonces, comenzaron las gestiones del Sr. Bezares Alamo para proteger la propiedad que había comprado.

Entre el 3 de agosto de 1988 y el 12 de enero de 1989, el Sr. Bezares Alamo presentó al Registro de la Propiedad para su inscripción la Escritura Núm. 41 de 25 de noviembre de 1986 sobre Compraventa y Subrogación de Obligación.[11] El 12 de enero de 1989, el Registrador por primera vez exigió el documento complementario –el Poder–, para poder inscribir a nombre del Sr. Bezares Alamo.

El 8 de mayo, el Sr. Bezares Alamo demandó en el Tribunal Superior, Sala de Caguas, a Caguas Federal Savings, la Sra. Wanda Cruz Alicea, Housing Real Estate y al Sr. Labrador. Solicitó la nulidad de la venta del

---

[11] Un certificado de Estudio de Título de 3 de agosto de 1988, enuncia como titular a la Sra. Wanda Cruz Alicea, igual hipoteca y un aviso de la demanda de ejecución de la hipoteca radicada por Caguas Central Savings. Al dorso de una copia certificada de la Escritura Núm. 41 sobre Compraventa y Subrogación de Obligación, ya presentada en la Sección Segunda del Registro de la Propiedad de Caguas, aparece una anotación, bajo la firma del Registrador, indicando que el 12 de enero de 1989, se había "Notificado hoy por los fundamentos incluidos en la notificación legajada bajo el número 513/221." Aparece también otra anotación a los efectos que la escritura había sido "Retirada para ser corregida. Caguas a 23 de enero de 1989". Otra Certificación Registral de 30 de diciembre de 1997, señaló que no existía asiento alguno en el Libro Diario de Operaciones que afectase a la finca, aún inscrita

inmueble en pública subasta y se responsabilizara a Housing Real Estate y al Sr. Labrador por omitir suplir el documento de Poder necesario para inscribir el inmueble a su nombre. Reclamó además, daños y perjuicios. No demandó al Lcdo. Pizarro Colón ni a Housing de Ponce y Caguas, Inc.

El Lcdo. Pizarro Colón asumió la representación legal de Housing Real Estate –de la cual era socio propietario–, y del Sr. Labrador. En moción de 8 de diciembre, y ante la alegación del Sr. Bezares Alamo de que el "Poder Especial" era nulo e inexistente porque no daba autorización al mandatario para vender la casa, el Lcdo. Pizarro Colón adjuntó copia de dicho "Poder Especial" que, según él, entregó al Sr. Bezares Alamo.

**En 8 octubre de 1991 y ante las repetidas ausencias del Lcdo. Pizarro Colón a vistas señaladas**, el Tribunal eliminó las alegaciones de Housing Real Estate y del Sr. Labrador. Eventualmente, el 14 de junio de 1992, dictó sentencia en la que concluyó, entre otras cosas, **negligencia de parte de** Housing Real Estate y el Sr. Labrador. Los condenó a pagar $46,870.00, más intereses legales pre-sentencia y honorarios de abogado. El 18 de diciembre, el Lcdo. Pizarro Colón presentó Moción informativa y solicitud de paralización de procedimientos indicando **que él y su esposa, Margarita Rodríguez "d/b/a/ Housing Real Estate"** habían presentado una petición de quiebra el 3 abril de 1989, **por lo que Housing Real Estate**

_____

a nombre de la Sra. Wanda Cruz Alicea, y gravada por la

**estaba acogida a los procedimientos de la ley de quiebra federal**.

El 13 de mayo de 1993, el Sr. Bezares Alamo presentó queja contra el Lcdo. Pizarro Colón ante el Colegio de Abogados. El 28 de junio, el Lcdo. Pizarro Colón contestó la queja y acompañó copia de las escrituras otorgadas ante él y del documento de "Poder Especial". Se señaló una vista ante la Comisión de Etica para el 9 de agosto de 1994. La notificación de vista al Lcdo. Pizarro Colón, certificada con acuse de recibo, fue devuelta al Colegio de Abogados el 1 de agosto, y remitida al día siguiente por correo ordinario al mismo apartado. El Lcdo. Pizarro Colón no la recibió, por lo que no compareció a la vista señalada.

VI

El cargo 1 imputó al Lcdo. Pizarro Colón no entregar al Sr. Bezares Alamo -comprador-, la Escritura de Protocolización de Poder, lo que le impidió inscribir su título en el Registro, hecho que motivó se ejecutara la hipoteca sobre el inmueble y el Sr. Bezares Alamo perdiera su inversión. El Colegio expuso en su moción de desistimiento, que la causa para la ejecución fue que no se pagó las mensualidades debidas y no el hecho de que el Lcdo. Pizarro Colón no entregara al Sr. Bezares Alamo, la Escritura aludida.

Correcta o no la apreciación del Colegio, la prueba demostró que la Escritura de Poder Especial de su faz tenía

hipoteca.

el grave defecto de estar firmada por persona distinta a la que el "Notary Public" certificó firmaba ante él. Es decir, el "Notary Public", Pedro C. Rodríguez certificó que el "Poder Especial" lo juró y firmó ante él, Alfredo Figueroa Santiago cuando en realidad la firma que aparece en el documento es la de la Sra. Wanda Cruz Alicea. Aun cuando este defecto anuló la Escritura y el Poder Especial que pretendió conferir, el Lcdo. Pizarro Colón lo protocolizó mediante Escritura Núm. 39 e inscribió el 26 de noviembre de 1986, en abierta y clara violación a la Ley Notarial de Puerto Rico y las normas éticas de la profesión. Peor aún, autorizó Escritura Núm. 41 sobre Compraventa y Subrogación de Obligación, en virtud del "Poder Especial" nulo, mediante la cual el Sr. Bezares Alamo adquirió de la Sra. Wanda Cruz Alicea -representada por la Sra. Raquel Cruz Alicea-, el inmueble P-16 sito en Juncos. No identificó la Escritura de Protocolización Núm. 39, ni adjuntó -luego de indicarlo-, el Poder Especial a la Escritura Núm. 41. Por sí solas, estas deficiencias anularon el negocio jurídico llevado a cabo y por ende hubieran impedido la inscripción del título.

Con su proceder transgredió la exigencia básica de que todo abogado "debe a sus clientes un trato profesional caracterizado por la mayor capacidad, la más directa lealtad y la más completa honradez. Una vez más faltó a su deber de defender los intereses de su cliente diligentemente, desplegando su más profundo saber y

habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable. 4 L.P.R.A. Ap. IX c. 18. In re: Crubb Acosta, 119 D.P.R. 595 (1987); In re: Vera Vélez, supra; In re: Torres Olmeda, supra; In re: Rodríguez Mena, supra; In re: Vergne Torres, supra. El Lcdo. Pizarro Colón actuó con evidente menosprecio de las consecuencias naturales que tenía el hecho de autorizar una Escritura de Compraventa a través de un "Poder Especial", cuya nulidad conocía o debió conocer.

Aceptamos el desistimiento del cargo Núm. 2, que imputó al Lcdo. Pizarro Colón no informar al Sr. Bezares Alamo –comprador–, la existencia de una prohibición de enajenar el bien inmueble objeto de la compraventa, mientras estuviese vigente subsidio del Departamento de la Vivienda bajo las disposiciones de la Ley Núm. 10 de 5 de julio de 1973. La evidencia refleja, que la certificación registral emitida el 4 de diciembre de 1987 por el Registrador, no hace referencia alguna a restricción o prohibición de enajenar, en virtud de tal programa de subsidio.

Finalmente, el cargo Núm. 3 imputó al Lcdo. Pizarro Colón conflicto de interés en dos circunstancias distintas. **Primero**, al participar en un negocio de compraventa de bienes, lucrándose del mismo –como socio de la firma de bienes raíces que tramitó la venta–, y también autorizar la Escritura de Compraventa que generó dicha gestión. **Segundo**, al aceptar una representación legal cuando su

juicio profesional estaba afectado por sus intereses personales.

Respecto a la primera situación, es evidente el conflicto de interés. En In re: Cancio Sifre, 106 D.P.R. 386 (1977), advertimos que la ausencia en los Cánones de Etica Profesional de una definición específica no invalidaba la norma de que un notario no debe autorizar documento público en el que es parte una corporación controlada por él económicamente, por ser una norma inherente a la responsabilidad social y profesional de los juristas y a la conducta moral que se espera de todo miembro de la profesión legal.

El interés tutelado es la preservación de la figura del notario "como funcionario imparcial, que recibe, expone y legitima la voluntad de los que ante él comparecen sin tomar bando, sin inclinarse a un lado u otro. Su inteligencia y su lealtad están comprometidas con una función ilustrativa que sirva y proteja a todas las partes por igual". In re: Cancio Sifre, supra, pág. 396.

En un intento por eximirse de la responsabilidad, el Lcdo. Pizarro Colón estipuló con el Colegio que las gestiones para la venta las realizó el Sr. Labrador. La prueba refleja lo contrario. Las gestiones de la compraventa fueron realizadas por el Sr. Labrador, **empleado y representante de la empresa corredora Housing Real Estate**, de la cual Pizarro Colón era socio por igual, y no por Housing de Ponce y Caguas, Inc. Además, una de las

partes demandadas en los casos originados por la compraventa gestada por Housing Real Estate, lo fue Housing Real Estate y no Housing de Ponce y Caguas, Inc. Se desprende también que el Lcdo. Pizarro Colón fue quien representó a Housing Real Estate, no a Housing de Ponce y Caguas, Inc., en los referidos casos y fue quien informó al Tribunal que Housing Real Estate estaba protegida por la Ley de Quiebras. Informó que él hacía negocios como Housing Real Estate.[12]

En cuanto a la segunda situación, el Canon 21 proscribe, en lo pertinente, que los abogados representen a un cliente cuando su juicio profesional puede ser afectado por intereses personales. In re: Toro Colberg, res. en 2 de abril de 1996, 140 D.P.R. ___. De este modo, se busca preservar una completa lealtad del abogado hacia su cliente, libre de ataduras personales. In re: Palau Bosch, res. en 30 de junio de 1999, 99 TSPR 132. El Lcdo. Pizarro Colón, no sólo aceptó representar al Sr. Labrador en el pleito incoado por el Sr. Bezares Alamo, sino que asumió la representación de la codemandada Housing Real Estates, de la cual era socio. La demanda imputaba nulidad de la compraventa –autorizada por el Lcdo. Pizarro Colón–, por haberse utilizado "Poder Especial" nulo, –protocolizado por el Lcdo. Pizarro Colón–. No hay duda de las ataduras que representaba tal representación, y de que

---

[12] No aceptamos, por tanto, la estipulación a los efectos de que quien hizo el negocio fue Housing de Ponce y

su juicio profesional se vería afectado por sus propios intereses. La prohibición de que un abogado litigue un caso sobre una escritura autorizada por él como notario, busca evitar hasta la apariencia de conducta impropia de parte del notario autorizante. Por ello, ningún abogado-notario puede representar a una de las partes otorgantes en una escritura autorizada por éste en un pleito posterior para exigir las contraprestaciones a que se obligó la otra parte. Urrutia de Basora, <u>Curso de Derecho Notarial Puertorriqueño</u>, Tomo I, pág. 221. Más aún, cuando su representación implica defender la validez del documento que él autorizó, contra el interés de su cliente otorgante y a favor de una compañía o sociedad de la cual, él es socio por igual.

Concluimos, que el Lcdo. Pizarro Colón violó las normas éticas antes expuestas, por lo que procede su separación de la profesión legal y notarial por el término de un (1) año.

Se dictará la correspondiente sentencia.

---

Caguas, Inc., por ser patentemente incompatible con la prueba.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

    Manuel Pizarro Colón          CP-96-9
                                     CP-97-8

SENTENCIA

    San Juan, Puerto Rico, a 25 de mayo de 2000

        Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte integrante de la presente, se dicta Sentencia y se suspende al Lcdo. Manuel Pizarro Colón del ejercicio la profesión legal y notarial por el término de un (1) año, contados desde la notificación de la presente y hasta que otra cosa disponga este Tribunal.

        El Tribunal le impone al Lcdo. Pizarro Colón el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándolos, les devuelva cualesquiera honorarios recibidos por trabajos no realizados, e informe oportunamente de su suspensión a los distintos foros judiciales y administrativos del país.

        Se ordena a la Oficina del Alguacil que incaute su obra notarial, incluso sello notarial, para ser remitida, examinada y oportunamente objeto de un Informe por parte de la Oficina de Inspección de Notarías.

        Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García no interviene. El Juez Asociado señor Fuster Berlingeri no intervino.

                        Isabel Llompart Zeno

Secretaria del Tribunal Supremo

Secretaria del Tribunal Supremo